In the district court of the United States for

the Southern District of Georgia

FILED
U.S. DISTRICT COURT
BRUNSWICK DIV.

2021 SEP -7 P 2: 00

CLERK
SO. DIST. OF GA.

Ambassador Patrick Roether
C/O P.O. Box 166
Meridian, Georgia 31319
  Plaintiff

And

Hollie Roether
C/O Patrick Roether
P.O. Box166
Meridian, Georgia 31319
  Plaintiff

CV221-083

  Vs

State of Georgia
206 Washington St.
Atlanta, Georgia 30303
Defendant

        And

State of Tennessee
425 5th Avenue
North
Nashville, Tennessee
37243
Defendant

        And

County of McIntosh
1200 North Way
Darien, Georgia
31305Defendant

        And

McIntosh County DFCS
1221 North Way
Darien, GA 31305
Defendant

And

County of Benton
1 Court Sq # 102
Camden, Tennessee 38320
Defendant

And

County of Houston
4725 E Main St #101,
Erin, TN 37061
Defendant

And

County of Carroll
625 High St # 101,
Huntingdon, TN 38344
Defendant

And

Benton County Sheriff Ken Christopher
116 Rosemary Avenue
Camden, TN 38320
Defendant

And

Benton County Sheriff's Deputy Christine Lambright
116 Rosemary Avenue
Camden, TN 38320
Defendant

And

McIntosh County Sheriff Steve
Jessup
12317 Georgia HWY 251
Darien, Georgia 31305
Defendant

And

McIntosh County Sheriffs Deputy Christopher Chapman
1660 Fair Hope Rd.

Townsend, Georgia 31331
Defendant

     And

McIntosh County Sheriff's Deputy Allen Perry
12317 Georgia Highway 251
Darien, Georgia 31305
Defendant

     And

McIntosh County Sheriff's Deputy Vicky Lee
12317 Georgia Hwy. 251
Darien, Georgia 31305
Defendant

     And

Alicia Gray
1221 North Way
Darien, GA 31305
Defendant

     And

Lashawnda Askew
425 Courson St
Brunswick GA
31520Defendant

     And

James Chamberlin
2219 Gloucester St,
Brunswick, GA
31520Defendant

     And

SGMC YOUTHCARE
2330 N. Ashley Street
Valdosta, Georgia
31602Defendant

     And

John Ledwich III CPNP, an

individual
101F. West Northside Drive
Valdosta, Georgia 31602
Defendant

And

Dr. Daniel B. Collipp D.O.
176 Memorial Dr
Jesup, GA 31545
Defendant

And

Carroll County Sheriff Andy Dickson126
West Paris Street
Huntingdon, Tennessee 38344
Defendant

     And

Houston County Sheriff Kevin Sugg
3330 Hwy149
Erin, Tennessee 37061
Defendant

     And

Assistant Attorney General Matthew Stowe
106 West Lake St.
Camden, TN 38320Defendant

     And

Judge Christy Balbo
1113 East Oglethorpe Highway
Hinesville, GA 31313 Defendant

     And

Molly Mcilvaine
370 Cinder Hill Dr
Brunswick GA 31523
Defendant

     And

Melissa Gonzalez
12317 Georgia HWY 251
Darien, Georgia 31305
Defendant

     And

Brennan
12317 Georgia HWY 251
Darien, Georgia 31305
Defendant

     And

Georgia Department Human Services
2 Peachtree St. NW
29th Floor
Atlanta, GA 30303-3142

Defendant

And

Georgia Department of Risk Management
c/o Liability Program Officer,
200 Piedmont Avenue,
Suite 1220, West Tower,
Atlanta, Georgia 30334
Defendant

And

Georgia Department of Health and Human Services
Division of Family and Children's Services
2 Peachtree St NW
19th Floor
Atlanta, GA 30303

And

County of Brantley
33 Allen Road,
Nahunta, GA 31553
Defendant

And

Len Davis
95 John Wilson St
Nahunta, GA 31553
Defendant

And

Isabella Amor, a.k.a., Amanda Beckwith, a.k.a.,
Hadassah D'Vorah, a.k.a., Esther Deborah Bat Yah
50 Stanfield Rd.
Franklin, North Carolina 28734
Defendant

And

Wade Bennett
95 John Wilson St
Nahunta, GA 31553
 Defendant

And

John Simpson

95 John Wilson St
Nahunta, GA 31553
Defendant

        And

McIntosh County Sheriff's Department
12317 GA-251,
Darien, GA 31305
Defendant

        And

Benton County Sheriff's Office
116 S Rosemary Ave,
Camden, TN 38320
Defendant

        And

Carroll County Sheriff's Office
200 Norandal Dr,
Huntingdon, TN 38344
Defendant

        And

Houston County Sheriff's Office
3330 TN-149,
Erin, TN 37061
Defendant

        And

Brantley County Sheriff's Office
95 John Wilson St,
Nahunta, GA 31553
Defendant

        And

Col. Danny Lowe
12317 GA-251,
Darien, GA 31305
Defendant

        And

Does 1 through 100 inclusive
Defendants

Complaint

Plaintiffs allege;

That the Plaintiffs Patrick Roether and Hollie Roether are an Y'Israelite man and woman, husband and wife, citizens of the Kingdom of Y'Israel living on Georgia within the confines of McIntosh County.

That the Defendants, are now and at all times material hereto as follows;

1. At all times applicable herein, defendant, COUNTY OF MCINTOSH, was, and is, a municipal corporation and governmental subdivision of the State of Georgia ("McIntosh County" or "County of McIntosh").

2. Steve Jessup, is an individual elected as the Sheriff for; McIntosh, County and CEO of McIntosh County of, Sheriff's Department. ("Jessup", "Steve Jessup")

3. At all times relevant herein, defendant DEPUTY CHRISTOPHER CHAPMAN ("Chapman"), is and was an individual residing in the County of McIntosh and employed by the County of McIntosh and/or Stephen Jessup, and/or McIntosh County Sheriff's Department. On information and belief, Chapman was an officer, agent, duly appointed, employed, and acting police officer for the McIntosh County Sheriff's Department, and/or Stephen Jessup and/or County of McIntosh, which is a municipal corporation and governmental subdivision of the State of Georgia. Specifically, Chapman was a Deputy and at all times mentioned herein, Chapman was acting under colour and pretense of the statutes, ordinances, regulations, customs, and usages of the State of Georgia, County of McIntosh and under the authority of his office as police for said County.

4. At all times relevant herein, defendant CRIMINAL INVESTIGATOR/CID/U.C.R. Vicky Lee ("Lee"), Badge No. 438113, is and was an individual believed to reside in the County of Camden and employed by the McIntosh County Sheriff's Department, and/or Stephen Jessup and/or County of McIntosh, On information and belief, Lee

was an officer, agent, duly appointed, employed, and acting deputy for the McIntosh County Sheriff's Department, and/or Stephen Jessup and/or County of McIntosh which is a municipal corporation and governmental subdivision of the State of Georgia. Specifically, Lee was a Criminal Investigator and at all times mentioned herein, Lee was acting under colour and pretense of the statutes, ordinances, regulations, customs, and usages of the State of Georgia, County of McIntosh and under the authority of her office as police for said County.

5. At all times relevant herein, defendant DETECTIVE/CID Col. Danny Lowe ("Lowe"), is and was an individual believed to reside in the County of Glynn and employed by the McIntosh County Sheriff's Department, and/or Stephen Jessup and/or County of McIntosh, On information and belief, Col. Danny Lowe was an officer, agent, duly appointed, employed, and acting deputy for the McIntosh County Sheriff's Department, and/or Stephen Jessup and/or County of McIntosh which is a municipal corporation and governmental subdivision of the State of Georgia. Specifically, Col. Danny Lowe was a Detective/ Criminal Investigator and at all times mentioned herein, Col. Danny Lowe was acting under colour and pretense of the statutes, ordinances, regulations, customs, and usages of the State of Georgia, County of McIntosh and under the authority of her office as police for said County.

6. At all times relevant herein, defendant DEPUTY RICHARD PERRY ("Percy"), is and was an individual believed to reside in the County of Glynn and employed by the McIntosh County Sheriff's Department, and/or Stephen Jessup and/or County of McIntosh. On information and belief, Percy was an officer, agent, duly appointed, employed, and acting deputy for the McIntosh County Sheriff's Department, and/or Stephen Jessup and/or County of McIntosh which is a municipal corporation and governmental subdivision of the State of Georgia. Specifically, Perry was a Deputy and at all times mentioned herein, Percy was acting under colour and pretense of the

statutes, ordinances, regulations, customs, and usages of the State of Georgia, County of McIntosh and under the authority of his office as police for said County.

7. At all times relevant herein, defendant Alicia Gray ("Gray") is and was an individual employed by the County of McIntosh, and/or McIntosh County DFCS, and/or State of Georgia, and/or Georgia Department of Human Services, and/or Georgia Department of Human Services Division of Family and Children's Services. At this time it is uncertain where Alicia Gray resides. On information and belief, Gray was an officer, agent, and employee of McIntosh County DFCS ("DFCS"). Specifically, Gray was an investigator and at all times mentioned herein, Gray was acting under the colour and pretense of the statutes, ordinances, regulations, customs, and usages of the State of Georgia, County of McIntosh and under the authority of her office as social worker / investigator for said County.

8. At all times relevant herein, defendant Lashawnda Askew ("Askew") is and was an individual residing in the County of Glynn and employed by the County of McIntosh, and/or McIntosh County DFCS, and/or the State of Georgia, and/or Georgia Department of Human Services, and/or Georgia Department of Human Services Division of Family and Children's Services. On information and belief, Gray was an officer, agent, and employee of McIntosh County DFCS ("DFCS"). Specifically, Askew was an investigator and at all times mentioned herein, Gray was acting under the colour and pretense of the statutes, ordinances, regulations, customs, and usages of the State of Georgia, County of McIntosh and under the authority of her office as director of the McIntosh County DFCS for said County.

9. At all times relevant herein, defendant Sergeant JAMES STENANDER ("Stenander"), is and was an individual believed to reside in the County of McIntosh and employed by the McIntosh County Sheriff's Department, and/or Stephen Jessup and/or County of McIntosh. On information and belief, Stenander was an officer,

agent, duly appointed, employed, and acting deputy for the McIntosh County Sheriff's Department, and/or Stephen Jessup and/or County of McIntosh which is a municipal corporation and governmental subdivision of the State of Georgia. Specifically, Stenander was a Sergeant and at all times mentioned herein, Stenander was acting under colour and pretense of the statutes, ordinances, regulations, customs, and usages of the State of Georgia, County of McIntosh and under the authority of his office as police for said County.

10.   At all times relevant herein, defendant Deputy Christine Lambright ("Lambright"), is and was an individual believed to reside in the County of Benton and employed by the County of Benton. On information and belief, Lambright was an officer, agent, duly appointed, employed, and acting deputy for the County of Benton which is a municipal corporation and governmental subdivision of the State of Tennessee. Specifically, Lambright was a Deputy and at all times mentioned herein, Lambright was acting under colour and pretense of the statutes, ordinances, regulations, customs, and usages of the State of Tennessee, County of Benton and under the authority of her office as police for said County.

11.  At all times relevant herein, defendant State of Tennessee is a corporate, legal individual, a subdivision of the UNITED STATES INC. doing business in the advertising and business services, which offers the following Goods and Services: the State of Tennessee Promotes public awareness of the activities of   the executive branch of Tennessee State Government. FIRST USE: 20141201. FIRST USE IN COMMERCE: 2 0 14 12 0 1[1] • IC 035. US 100 101 102 is the classes of goods and services the State of Tennessee operates under. 100: Miscellaneous, 101: Advertising, and business 102: Insurance and financial[2]

---

[1] http://tmsearch.uspto.gov/bin/showfield?f=doc&state=4808:8cm4ez.2.1

[2] https://ptrca.org/files/handouts/US_TM_Number_Guide_2011.pdf

12. At all times relevant herein, defendant State of Georgia is a is a corporate, legal individual, a subdivision of the UNITED STATES INC.

13. At all times relevant herein, defendant Ken Christopher, is an individual elected as Sheriff for; Benton, County and CEO of Benton County of, Sheriff's Department.

14. At all times relevant herein, defendant Andy Dickson, is an individual elected as Sheriff elect For; Carroll, County and CEO of Carroll County of, Sheriff's Department.

15. At all times relevant herein, defendant Kevin Sugg, is an individual elected as Sheriff elect For; Houston, County and CEO of Houston County of, Sheriff's Department.

16. At all times applicable herein, defendant, County of Carroll, was, and is, a municipal corporation and governmental subdivision of the State of Tennessee ("Carroll County" or "County of Carroll").

17. At all times applicable herein, defendant, County of Houston, was, and is, a municipal corporation and governmental subdivision of the State of Tennessee ("Houston County" or "County of Houston").

18. At all times applicable herein, defendant, Assistant Attorney General Matthew Stowe ("Stowe") is an individual that was elected as District Attorney General for the State of Tennessee. Upon information and belief Stowe was an officer, agent, duly appointed, employed, and acting District Attorney serving County of Benton which is a municipal corporation and governmental subdivision of the State of Tennessee. Specifically, Stowe was acting as a District Attorney and at all times mentioned herein, Stowe was acting under colour and pretense of the statutes, ordinances, regulations, customs, and usages of the State of Tennessee, County of Benton and under the authority of his office as attorney for said County and state.

19. At all times relevant herein, defendant Deputy Alan Bolan ("Bolan"), is believed to reside in the County of Benton and employed by the County of Benton. On information

and belief, Bolan was an officer, agent, duly appointed, employed, and acting deputy for the County of Benton which is a municipal corporation and governmental subdivision of the State of Tennessee. Specifically, Bolan was a Deputy and at all times mentioned herein, Bolan was acting under colour and pretense of the statutes, ordinances, regulations, customs, and usages of the State of Tennessee, County of Benton and under the authority of her office as police for said County.

20. At all times relevant herein, defendant James Chamberlin is a privately hired barrister contracted with the State of Georgia to act as a prosecutor for said state, acting under the colour and pretense of the statutes, ordinances, regulations, customs, and usages of the State of Georgia, County of McIntosh and is not a constitutional mandated office neither appointed or elected.

21. At all times relevant herein, defendant Melissa Gonzales ("Gonzales"), is believed to reside in the County of McIntosh and employed by the McIntosh County Sheriff's Department, and/or Stephen Jessup and/or County of McIntosh. On information and belief, Gonzales was an officer, agent, duly appointed, employed, and acting deputy for the McIntosh County Sheriff's Department, and/or Stephen Jessup and/or County of McIntosh which is a municipal corporation and governmental subdivision of the State of Georgia. Specifically, Gonzales was a Jailer and at all times mentioned herein, Gonzales was acting under colour and pretense of the statutes, ordinances, regulations, customs, and usages of the State of Georgia, County of McIntosh and under the authority of his office as police for said County.

22. At all times relevant herein, defendant Brennan ("Brennan"), is believed to reside in the County of McIntosh and employed by the McIntosh County Sheriff's Department, and/or Stephen Jessup and/or County of McIntosh. On information and belief, Brennan was an officer, agent, duly appointed, employed, and acting deputy for the McIntosh County Sheriff's Department, and/or Stephen Jessup and/or

County of McIntosh which is a municipal corporation and governmental subdivision of the State of Georgia. Specifically, Brennan was a Jailer and at all times mentioned herein, Gonzales was acting under colour and pretense of the statutes, ordinances, regulations, customs, and usages of the State of Georgia, County of McIntosh and under the authority of his office as police for said County.

23. At all times relevant herein, defendant JOHN LEDWICH III ("John Ledwich III") is believed to be an individual residing in the County of Lowndes and employed by SGMC. On information and belief, John Ledwich III was an officer, agent, and employee of SGMC. Specifically, John Ledwich III was acting within the course and scope of his duties as a SGMC employee when he performed an invasive medical examination on Y.R. without a warrant or parental consent.

24. At all times relevant herein, defendant Dr. Daniel B. Collipp D.O. ("Collipp") is believed to be an individual residing in the County of Wayne. On information and belief, Collipp was and is a contractor of the County of McIntosh and the McIntosh County DFCS. Specifically, Collipp was acting within the course and scope of his duties as a contractor when he performed an invasive medical examination on L.R. without a warrant or parental consent.

25. Molly Mcilvaine (Mcilvaine) at all times relevant to this claim is a barrister acting as a Guardian ad Litem, upon information and belief is paid by the County of McIntosh and/or State of Georgia. Upon information and belief Mcilvaine is an individual residing in the County of Glynn. On information and belief, Mcilvaine was and is a contractor of the County of McIntosh, State of Georgia and the McIntosh County DFCS.

26. Christy Balbo (Balbo) at all relevant to this claim is an individual acting as a Judge for the McIntosh County Juvenile Court. Balbo is an individual residing in the County of Bryan. On information and belief Balbo was and is a contractor of

McIntosh County, State of Georgia, and the McIntosh County DFCS.

27. Georgia Department Human Services, Georgia Department of Risk Management, and Georgia Department of Human Services Division of Family and Children's Services at all times relevant to this claim are agencies of the State of Georgia. At all times herein mentioned and with respect to the specific matters alleged in this Complaint, Plaintiffs are informed and believe the Defendant was a parent, subsidiary, affiliate, alter ego, partner, agent, franchisee, licensee, employee, employer, controlling franchiser, controlling licensor, principal, and/or joint venture, of each of the Respondents in the Claim, as well as surety for said respondents and was at all times acting within the course and scope of such agency, service, employment, control and/or joint venture, and each Respondent has ratified, approved, conspired in, profited from and/or authorized the acts of each respondent therein said claim and/or failed to prevent such acts when having the power and/or duty to do so, with full knowledge of said acts.

28. At all times applicable herein, defendant, COUNTY OF BRANTLEY, was, and is, a municipal corporation and governmental subdivision of the State of Georgia ("Brantley County" or "County of Brantley").

29. Len Davis is an individual elected as the Sheriff for; Brantley, County and CEO of Brantley County of, Sheriff's Department.

30. Isabella Amor, a.k.a., Amanda Beckwith, a.k.a., Hadassah D'Vorah, a.k.a., Esther Deborah Bat Yah is an individual acting in concert with Defendant's Len Davis, Wade Bennett, John Simpson, and possibly County of McIntosh. Isabella Amor et. Al., hereinafter Isabella Amor is a resident of Macon County North Carolina.

31. At all times relevant herein, defendant Wade Bennett, is and was an individual believed to reside in the County of Wade and employed by the Brantley County Sheriff's Office, and/or Len Davis and/or County of Brantley. On information and

belief, Bennett was an officer, agent, duly appointed, employed, and acting deputy for the Brantley County Sheriff's Department, and/or Len Davis and/or County of Brantley which is a municipal corporation and governmental subdivision of the State of Georgia. Specifically, Bennett was a Sergeant and at all times mentioned herein, Bennett was acting under colour and pretense of the statutes, ordinances, regulations, customs, and usages of the State of Georgia, County of Brantley and under the authority of his office as police for said County.

32. At all times relevant herein, defendant John Simpson, is and was an individual believed to reside in the County of Wade and employed by the Brantley County Sheriff's Department, and/or Len Davis and/or County of Brantley. On information and belief, Simpson was an officer, agent, duly appointed, employed, and acting deputy for the Brantley County Sheriff's Department, and/or Len Davis and/or County of Brantley which is a municipal corporation and governmental subdivision of the State of Georgia. Specifically, Simpson was a Sergeant and at all times mentioned herein, Simpson was acting under colour and pretense of the statutes, ordinances, regulations, customs, and usages of the State of Georgia, County of Brantley and under the authority of his office as police for said County.

33. Defendant McIntosh County Sheriff's Office is a municipal Corporation, organized and existing as such under the laws of the State of Georgia.

34. Defendant Brantley County Sheriff's Office is a municipal Corporation, organized and existing as such under the laws of the State of Georgia.

35. Defendant Benton County Sheriff's Office is a municipal Corporation, organized and existing as such under the laws of the State of Tennessee.

36. Defendant Houston County Sheriff's Office is a municipal Corporation, organized and existing as such under the laws of the State of Tennessee.

37. Defendant Carroll County Sheriff's Office is a municipal Corporation, organized

and existing as such under the laws of the State of Tennessee.

38. Individual defendants are at all times relevant to this action acting under the color of State law, in their individual as well as official capacities.

39. DEFENDANT DOES 1 through 100 are sued as fictitious names, their true names and capacities being unknown to Plaintiffs. When ascertained, Plaintiffs will amend this Complaint by inserting their true names and capacities. Each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and those Defendants proximately caused, are responsible for and/or legally liable for Plaintiffs' damages as herein alleged. Each reference in this complaint to "Defendant," "Defendants," or a specifically named Defendant refers to and includes all Defendants sued under fictitious names.

40. Plaintiffs make all allegations contained in this Complaint against all Defendants, including DOES 1 through 100.

41. Whenever reference is made in this complaint to any act of Defendants, such allegations shall be deemed to mean all named Defendants and DOES 1-100 or their officers, agents, managers, representatives, employees, heirs, assignees, customers, tenants, who did or authorized such acts while actively engaged in the operation, management, direction or control of the affairs of Defendants and while acting within the course and scope of their duties, except as specifically alleged to the contrary.

42. Whenever reference is made in this complaint to any act of Defendants, such allegations shall be deemed to mean all named Defendants or their officers, agents, managers, representatives, employees, heirs, assignees, customers, tenants, who did or authorized such acts while actively engaged in the operation, management, direction or control of the affairs of Defendants and while acting within the course and scope of their duties, except as specifically alleged to the contrary.

43. At all times herein mentioned and with respect to the specific matters alleged in this Complaint, Plaintiffs are informed and believe that each Defendant (including DOES 1 through 100), was a parent, subsidiary, affiliate, alter ego, partner, agent, franchisee, licensee, employee, employer, controlling franchiser, controlling licensor, principal, and/or joint venturer of each of the remaining Defendants, and was at all times acting under colour and pretense of the statutes, ordinances, regulations, customs, and usages of their state and counties agency, service, employment, control and/or joint venture, and each defendant has ratified, approved, conspired in, profited from and/or authorized the acts of each of the remaining Defendants and/or failed to prevent such acts when having the power and/or duty to do so, with full knowledge of said acts.

## Jurisdiction

Plaintiffs re-alleges, and incorporates herein as set forth in full, paragraph 1-35.

This action arises under the United States Constitution, particularly under the provisions of the 1 st, 4th, 5th, 8th, and 14th Amendments of the Bill of Rights and the Constitution of the United States of America and under Federal Statute 96-1211, Department of Justice Regulations 341-232/1545 entitled "Federal Standards for Prisons and Jails", and particularly under Title 42 Section 1983 of the United States Code and the Georgia Tort Claims Act.

This court has jurisdiction of the cause under, and by virtue of, Title 28 Sections 1331, 1343 and 1391 of the United States Code. This cause is brought as diversity of citizenship action pursuant to title 28 Section 1332 of the United States Code. Each and all of the acts of the Defendants alleged herein were done by the Defendants, and each of them acted not as an individual, but under the colour and pretense of the statutes, ordinances, regulations, customs, and usages of the State of Georgia, County of

McIntosh, County of Brantley, and the State of Tennessee, County of Benton, County of Houston, County of Carroll under the authority of their offices and/or contracts as either police officers, social workers, prosecutors, or sheriff's for said counties or states.

General Allegations

Plaintiffs re-alleges, and incorporates herein as set forth in full, paragraph 1-43, and Jurisdiction.

44. Plaintiffs Ambassador Patrick Roether and his wife Hollie Roether and their two children, L.R. and Y.R., constituted a family unit, entitled to constitutional protections, including, but not limited to, the right to live together free of unwarranted governmental interference, the right to familial privacy, and the right of a mother, and father to reasonably direct the upbringing of their children, including medical care and medical decisions for their children.

45. In addition, Plaintiffs and their children enjoyed a separate and distinct right to live together without undue governmental interference.

46. *As* of September 7, 2019, Chapman, and Perry entered and forever changed Plaintiffs and their children's lives, Y.R. was 7 months old and L.R. was 34 months old. Plaintiff's had been properly caring for L.R. and Y.R. and enjoyed a strong and loving bond with them.

47. Hollie had been breastfeeding Y.R. at the time of events as described herein.

48. Patrick and Hollie are an Y'Israelite man, and woman whom obeys Torah, to the best of their knowledge, now and at the time of events as described herein.

49. Patrick along with his wife Hollie raised L.R. and Y.R. according to Torah.

50. Plaintiffs have rejected institutionalized churches and sought to return to the early, simple, life deemphasizing material success, rejecting the competitive spirit, and seeking to insulate themselves from the modern world. As a result of Plaintiff's common heritage, Y'Israelites today are characterized by a fundamental belief that salvation

requires a obedience to Torah separate and apart from the world and worldly influence. This concept of life aloof from the world and its values is central to Plaintiff's faith.

51. A related feature of Y'Israelites are their devotion to a life in harmony with nature and the soil, as exemplified by the simple life of the early establishment of the earth that continued in America during much of our early national life.

*The Family resting on the Sabbath day*

Plaintiffs re-alleges, and incorporates herein as set forth in full, paragraph 1-51, and Jurisdiction

52. At the time subject to this complaint, In obedience to Torah Patrick, Hollie L.R. and Y.R. worked 6 days and rest on the 7th day from Friday evening at sun down to Saturday evening at Sundown. Plaintiffs have now changed the time the Sabbath starts from Saturday at dawn to Sunday at dawn in accordance to newly discovered evidence.

53. On September 7, 2019, a Sabbath day, Patrick and Hollie were in their house when L.R. went to play outside in the goat barn that was located right outside of their dwelling. Hollie was playing with Y.R. and Patrick was reading.

*L.R. becomes quiet*

Plaintiffs re-alleges, and incorporates herein as set forth in full, paragraph 1-53, and Jurisdiction

54. Shortly after 6:10 p.m. Patrick heard the dogs barking and L.R. became quiet. Patrick and Hollie went outside in search of L.R. but could not find her. Patrick called elder EJ on the phone around 6:34 p.m. and proceeded to get into the truck and drove out of the driveway when he ran over a water bottle that went woosh from being filled with water. This water bottle was not there the previous day when Patrick parked the truck.

55. Patrick traveled out the driveway and approximately a mile down Hwy. 99 Darien Georgia where he saw multiple police vehicles. Patrick waved at them and pulled over and informed them that his daughter L.R. was missing.

56. Chapman informed Patrick that L.R. was found walking down Hwy. 99 Darien, Georgia and picked up by a passerby, put into an ambulance and taken to the McIntosh County Sheriff's Department.

57. Chapman interviewed Patrick. Chapman repeatedly badgered Patrick about the whereabouts of Hollie and their dwelling place. Patrick provided a summary to Chapman. Patrick explained, to the best of his recollection, that L.R. had become quiet while playing outside with the baby goats in the goat barn. At no time did Chapman inform Patrick of his rights nor did Chapman inform Patrick that he was being interrogated or suspected of a crime.

58. Patrick informed Chapman that he was unaware of how L.R. disappeared.

59. Chapman demanded that Patrick take him back to his house where his wife was located.

*Chapman Arrives at Patrick and Hollie's dwelling and Forms a Plan to Seize Patrick,*

*Hollie, and YahCora Without First Obtaining a Warrant*

Plaintiff re-alleges, and incorporates herein as set forth in full, paragraph 1-59, and Jurisdiction.

60. Chapman, Perry, and Griffith arrived at Patrick and Hollie's dwelling in the woods off of Hwy. 99 Darien, Georgia around 7:15 p.m. on September 7, 2019.

61. At Approximately 7:20 p.m. Chapman began to interview Hollie. Chapman asked Hollie for her name. Hollie informed Chapman that she did not feel comfortable speaking to him. Chapman again asked Hollie for her name. Hollie responded "You have a warrant?". Chapman became belligerent and infuriated with Hollie's claim of rights and said "alright go ahead and place them both in handcuffs" and went after

Hollie to apprehend her while Perry put Patrick in handcuffs.

62. Chapman violently grabbed, pulled, abused, assaulted, and man handled Hollie when he grabbed Hollie's arm and then man handled Hollie when he put her in a choke hold and wrist lock while she was holding Y.R. while Perry simultaneously jerked pulled, abused, assaulted and man handled Y.R. until he was able to jerk her by force out of Hollie's arms. Hollie was helpless while her baby screamed in pain and sheer terror. Hollie was thrown and pounded into to the ground where Christopher Chapman used his body to hold Hollie to the ground and then applied handcuffs to Hollie's wrists causing damage to her eye, ear, body, and collar bone.

63. Hollie was taken straight to jail by Chapman, and Patrick was taken straight to jail by Perry. Plaintiffs were both deposited in the McIntosh County Jail without being taken before a magistrate, without a warrant and without being charged with a crime. Upon information and belief Chapman, Vicky Lee, and Perry worked in concert with and relied on McIntosh County DFCS agents Alicia Gray and Lashawnda Askew to strategically choose a crime required to invoke a mandatory Petition for termination of Parental Rights, if convicted, to be filed with the intent to move L.R. and Y.R. through the adoption process more quickly with the ultimate goal to accumulate state, federal, and county funds including but not limited to adoption proceeds. This belief is based on the fact that both Plaintiff's asked Chapman and Perry what they were being charged with and Chapman and Perry replied. "I don't know DFCS is working on that."

64. On September 7, 2019, Defendants Perry, Chapman, and Griffith, and each of them, discussed L.R.'s proposed seizure/removal from Plaintiffs' custody. Defendants Perry, Chapman, and Griffith, and each of them, agreed to seize L.R. from her parents' (the Plaintiff's) care, without prior judicial authorization, warrant, and/or court order. At the time they seized the child, L.R., they knew, as any reasonable government official would, that it is unlawful to seize a child from the

custody of its parents without first obtaining a warrant, unless at the time of the seizure the government agent is in possession of specific and articulable evidence to show that the child is in immediate danger of suffering severe bodily injury or death in the time it takes to obtain a warrant - and, that there is no lesser intrusive alternative means of averting that specific injury.

65. Before seizing the child Y.R., without first obtaining a warrant, Perry, Chapman, and Griffith, and each of them, participated in Y.R.'s proposed seizure and removal from Plaintiffs' custody. Defendants Perry, Chapman, and Griffith, and each of them, agreed to also seize Y.R. without judicial authorization and/or court order. At the time they seized the child, Y.R., they knew, as any reasonable government official would, that it is unlawful to seize a child from the custody of its parents without first obtaining a warrant, unless at the time of the seizure the government agent is in possession of specific and articulable evidence to show that the child is in immediate danger of suffering severe bodily injury or death in the time it takes to obtain a warrant - and, that there is no lesser intrusive alternative means of averting that specific injury. Nonetheless, Defendants Perry, Chapman, and Griffith, and each of them, agreed to seize Y.R, and did in fact seize Y.R. without a warrant, and in the absence of any exigent circumstance.

66. On September 7, 2019, Defendants Perry, Chapman, and Griffith, and each of them, discussed Plaintiffs arrest. Defendants Perry, Chapman, and Griffith, and each of them, agreed to arrest Patrick and Hollie without prior judicial authorization and/or court order. At the time they arrested Patrick and Hollie they knew, as any reasonable government official would, that it is unlawful to arrest someone without first obtaining a warrant, unless at the time of the arrest the government agent witnesses an offense in the agents presence, or with his or her immediate knowledge, if the offender is attempting to escape, or there is probable cause to believe

an act of family violence has occurred.

67. After Hollie was deposited at the McIntosh County jail she requested a phone call however was denied under the watchful eye of Defendant Jessup.

### McIntosh County DFCS Agency Gets Involved

Plaintiffs re-alleges, and incorporates herein as set forth in full, paragraph 1-67, and Jurisdiction

68. At some time the evening of September 7, 2019, an unnamed person from the McIntosh County Sheriff's office contacted the McIntosh County DFCS Agency. Alicia Gray responded to the McIntosh County Sheriff's office.

69. Upon information and belief Investigator Alicia Gray was advised that L.R. was at the McIntosh County Sherriff's Office and would be staying there until she arrived. Thus, there was sufficient time for Gray, or anyone else, to obtain a warrant if it appeared detention of the child, or children was necessary in order to avert injury.

70. Upon information and belief Investigator Alicia Gray was advised that Y.R. was at the McIntosh County Sherriff's Office and/or in route to the McIntosh County Sherriff's Office and would be staying there until she arrived. Thus, there was sufficient time for Gray, or anyone else, to obtain a warrant if it appeared detention of the child, or children was necessary in order to avert injury.

71. At no time did Perry, Chapman, and Griffith voice concerns that L.R. and Y.R. was in immediate risk of injury or death or that Hollie and/or her husband might attempt to flee with Y.R. and/or L.R. within the time it would have taken to obtain a warrant.

72. Patrick and Hollie were detained in the McIntosh County jail from September 7, 2019 around 7:35 p.m. to Monday September 9, 2019, around 6:00 p.m. without a warrant, without a hearing, and without a bond.

73. To this day neither Patrick or Hollie has ever had a hearing over the charges

Cruelty to Children in the Second degree and Obstruction of a Law Enforcement Officer.

74. At no time did Gray attempt to locate a caregiver for Y.R. and L.R. as opposed to foster care.

75. Defendant Gray removed L.R. and Y.R. from the location of the McIntosh County jail/Sheriff's Office and detained L.R. and Y.R. from the care, custody, and control of the Plaintiff's at an undisclosed location the evening of September 7, 2019. In addition, without a lawfully obtained court order or exigency defendant's Askew, Gray, Chapman, Perry, Lee and Col. Danny Lowe caused Plaintiff's children to be physically examined, treated, and detained without cause or consent; and knowingly and intentionally continued to detain Plaintiff's children from the care, custody, and control of their mother Hollie, and father Patrick without just cause, by concealing evidence, misleading the dependency court, falsifying evidence, giving false testimony, failing to divulge exculpatory evidence, committing perjury, and exercising undue influence over Plaintiffs daughter L.R. while she was a minor in order to obtain evidence.

76. Gray, Lee, Chapman, Perry, Col. Danny Lowe refused to let Hollie breast feed Y.R., which deprived Y.R. of life sustaining substance for good health and nutrition.

77. While Y.R. was in the care of Gray on September 7, 2019, Gray left the same diaper on Y.R. which caused a prior, almost healed diaper rash, to become irritated, and inflamed. Gray later blamed Plaintiff's for the injury that Gray inflicted on Y.R. by Gray's neglect to change her Orange cloth diaper.

78. Social Workers and the agency knew there was no evidence to support allegations against Plaintiffs. They also knew that Hollie and Patrick were fit and proper parents. In fact Askew testified on September 9, 2019 that she didn't believe that L.R. and Y.R. would be in imminent danger if they were returned to Patrick

and Hollie. Askew further stated on October 23, 2019 that the only thing keeping her from returning L.R. and Y.R. to Plaintiffs was DNA testing showing that Patrick and Hollie were the children's parents even though Askew knew and believed that the Plaintiffs were both Y.R. and L.R.'s mother and father. Askew stated "That's all we are asking, if you do the DNA we don't have a problem returning your kids" "All we are asking you to do is the DNA". Nonetheless Defendant's Askew, Gray, and Chamberlin repeated the baseless allegations in every document they prepared and presented to the court including but not limited to proposed court orders.

79. Askew falsely stated in her petition including but not limited to that;

    a. L.R. and Y.R. were without a legal guardian and/or parents,

    b. The mother, Hollie Henry used her baby as a shield and then turned violent against the officer in an effort to try and avoid being arrested.

    c. The mother has outstanding warrant from the state of Tennessee for aggravated kidnapping and failure to appear which relates to her 3 other children.

    d. The children are currently without a legal guardian.

    e. Both children had a bad odor, and were not appropriately dressed.

80. Based on Gray, and Askew's fabricated story and suppression of facts, the court issued a dependency removal order removing Y.R. and LR. from the custody, care, and comfort of their mother and father on September 9, 2019.

81. Askew refused to correct the Petition when the truth of the matter was brought to her attention. Defendant Askew, Balbo, and Gray knew the above mentioned statements were false however concealed the truthful facts from the record and left the false statements in the record even after confronted about it by the Plaintiff's.

82. To add insult to injury Askew left Y.R. and L.R. in the same foster home with John Doe 8 and Jane Doe 9 for over a month even though the foster parents wanted Y.R.

and L.R. moved because they opposed the natural treatments they were required to give L.R. and Y.R. for their illness, that L.R. and Y.R. contracted under the watchful eye of Askew, and suffered from the entire 3 and a half months in foster care. The John Doe 8 and Jane Doe 9 wanted L.R. and Y.R. to receive pharmaceuticals and be vaccinated even though Askew claimed that the foster parents were the only placement that agreed to adhere to Plaintiffs religious beliefs. Jane Doe 9 and John Doe 8 foster parents refused to give L.R. and Y.R. the natural medicine and left them to suffer from their runny noses, coughs, and chest congestion the entire duration of their stay in the foster parents care.

83. Instead of helping L.R. and Y.R. heal from their illness with the natural treatments that were provided by Plaintiffs, Askew, Gray, Balbo, and Chamberlin did nothing to help Y.R. and L.R. instead left them to suffer in foster care in the same foster home without any treatment whatsoever, for well over two months, to punish Plaintiffs for their religious beliefs of not administering pharmaceutical drugs to their daughters.

84. On November 12, 2019 Askew, Chamberlin, and Balbo concocted a plan to override Plaintiffs religious beliefs when they allowed John Doe 5 to do invasive procedures on L.R. and Y.R. at an emergency Room, including but not limited to swabbing their mouths and extracting and testing their bodily fluids.

85. Balbo after recusing herself from the Juvenile Court case on November 8, 2019 acted without Jurisdiction when she spoke to Askew ex parte and gave her consent to take Y.R. and L.R. to the emergency room for examinations and invasive procedures against our will and against our religious beliefs, while another Judge had already taken over the case.

86. On or about November 11, 2019 Defendant Chamberlin knowingly, willfully, with intent, forethought and malice prepared an Affidavit for Defendant Collipp that

contained the mere repetition of the language in O.C.G.A. 15-11-107 (c) with the intent to override Plaintiffs religious objections to administer pharmaceutical drugs to L.R. and Y.R.

87. Collipp and Chamberlin profit off of parents including but not limited to the Plaintiffs and their children, with these affidavits by forcing services upon them and then billing for the services from state, county, and federal funds.

88. Collipp and Chamberlin's actions appear to be a malicious intent to receive funding, and put pressure on Plaintiff's to submit to McIntosh County DFCS, and Askew, and Gray's service demands, such as parenting classes, and assessments. Dr. Daniel B. Collipp's diagnosis of L.R. and Y.R. meets the requirements for reimbursement. J21.9, J18.9, H10.013, H66.003, and 200.121, which Collipp used for reimbursement purposes are all billable/specific ICD-10-CM codes that can be used to indicate a diagnosis for reimbursement purposes.

89. James A. Chamberlin's preparation of the affidavit that agents of the McIntosh County DFCS submitted to Collipp for his signature is a continuation of their religious persecution against the Plaintiffs to compel them to conform to the image of their Permanency Plan.

90. On or about Friday December 6, 2019 Chamberlin applied to the court for leave for the McIntosh County DFCS to apply for a delayed certificate of birth for L.R. and Y.R. against Plaintiff's religious beliefs with the intent to profit off of L.R. and Y.R.

91.   Chamberlin drafted Collipps testimony to encourage Collippp to present his affidavit with the key phrase, "Life Threatening or will result in serious disability unless medical treatment is provided", in order to misrepresent facts to alter the judicial machinery of the court to sign a court order authorizing agents of the McIntosh County DFCS to administer pharmaceutical drugs to L.R. and Y.R. against Plaintiff's religious beliefs.

92.   Dr. Collipp misdiagnosed L.R. and Y.R. with Acute bronchiolitis, unspecified -J21.9 (Primary), Pneumonia, unspecified organism - J18.9, Acute follicular conjunctivitis, bilateral - H10.013, Acute suppurative otitis media without spontaneous rupture of ear drum, bilateral - H66.003 and treated her with an antibiotic which destroyed her digestive track, and almost killed L.R. when the antibiotics caused a severe C-difficile infection in her colon that caused her pain and explosive foul diarrhea.

93.   Askew continued to reiterate the false statements as stated herein above when she approved Review and approved summaries she knew would be filed with the Juvenile court. Askew knew that these reports were the defendant's primary method of communicating with the juvenile court, and they expected the court to rely on the reports. In fact, these review reports are regularly accepted into evidence and form the basis for juvenile court decisions - and defendants are aware that the statements they make in such reports can have the same weight as testimony offered in live court.

94.   Defendant Askew and Gray unlawfully, and without just cause detained Plaintiffs daughters from September 7, 2019 until December 17, 2019.

### Hollie is tortured by Officer Gonzales and Brennan

Plaintiffs re-alleges, and incorporates herein as set forth in full, paragraph 1-94, and Jurisdiction as if it was fully rewritten.

95.   On the evening of September 7, 2019 at the McIntosh County Jail Defendants Gonzales and Brennan demanded that Hollie take a shower and submit to the booking process including but not limited to surrendering Hollie's Photograph and Fingerprints. Hollie informed Gonzales that she was sitting in jail without being brought before a magistrate, and without a warrant, and/or court order. Hollie informed them that they would need to get a warrant and/or court order before she would submit to any booking process.

96.    Defendants Gonzales and Brennan were infuriated by Hollie's claim of rights, and Gonzales began to cut and rip Plaintiffs pants off of her while Brennan cut and ripped Hollie's shirt off of her. Then Gonzales and Brennan grabbed Hollie's pants and panties each on the opposite side of Hollie and forced them off of Hollie's body against her will while they verbally abused and assaulted Hollie with the intent and purpose of humiliating and embarrassing Hollie in the presence of the people at the scene. Hollie was left naked and humiliated in front of the other people there, including men.

97.    After this assault on Hollie officer Brennan brought in a water hose with a high pressure nozzle into the shower area of booking and sprayed Hollie directly on the right side of her head with scolding hot water which caused damage to her eye, ear and throat. Brennan sprayed Hollie's whole body with scolding hot water, which was noticeably steaming, with extra emphasis on her buttocks, vagina, and right thigh causing Hollie extreme pain, forcing compliance by pain. Hollie told Officer Brennan in plain unmistakable language to stop that she was hurting her. Brennan did not stop and neither Gonzales or the other Does present intervened in any way.

98.    After Brennen was done with this assault on Hollie she went and got a bucket of soap mixed in scolding hot water and threw it on Hollie which landed straight in her ear, all over her hair, and in her eye causing Hollie great pain. Hollie could not see or hear out of her right ear and right eye for over a week. Hollie's hair is still damaged from this assault including but not limited to brittle and stunted growth. Hollie told defendant Brennen in plain unmistakable language to stop that she was hurting her and that she did not want chemicals on her or her hair. Brennan then got the water hose and sprayed Hollie with scolding hot water, that was noticeably steaming, again while she verbally abused Hollie with the intent and purpose of humiliating and embarrassing Hollie in the presence of the people at the scene.

99.    Gonzales and Brennan forced Hollie to put on mingled fabric clothing against

Hollie's religious beliefs. Neither Brennan or Gonzales provided Hollie with clothing that did not contain mingled fabric. Hollie under duress and threat of further abuse put the clothing on against her will to preserve her well-being and dignity while in captivity of the McIntosh County Jail and to prevent further assault against her body and her life. Hollie wrote an inmate request for clothing that was not mingled fabric and got the reply to contact your attorney when Hollie didn't even have an attorney. Hollie did not wear the mingled fabric while alone in solitary confinement. Hollie's administrative requests were all denied including but not limited to access to the law library, phones, and addresses to the different court houses in Tennessee and Brunswick in order to defend herself.

100. Gonzales and Brennan refused to disclose their full names when Hollie asked them.

101. John Doe 1 then led the next assault on Hollie when he grabbed and squeezed Hollie's hand for the purpose of stealing Hollie's fingerprints. Hollie informed John Doe 1 that Hollie had not been taken before a magistrate and there was no warrant for Hollie's arrest and no court order for Hollie's fingerprints, and that John Doe would need to obtain these before Hollie would voluntarily submitted to the booking process. John Doe 1 threatened to stack charges against Hollie if she did not comply with the fingerprint process. Hollie did not comply with the fingerprint process. John Doe 1 then forcefully stole Hollie's fingerprints in denial of Hollie's 5th amendment right as it applies to Hollie.

102. On September 8, 2019 around 12:00 p.m. Hollie was taken to solitary confinement by Gonzales after another inmate became belligerent towards Hollie in response to Hollie reading a bible that was given to her moments before. Gonzales discriminated against Hollie for her religious exercise when she took Hollie to solitary confinement, as a punishment, instead of the instigator, knowing Hollie

would not have equal access to showers, phone, kiosk or recreational activities.

103. From September 8, 2019 to September 13, 2019 Hollie was kept in solitary confinement by herself. During this time Hollie was denied access to the law library and was made to eat all of her food on her bed. Hollie was not given a table or desk to eat her food in sanitary conditions. Hollie did not have equal access to the phones as the other inmates did nor did she have access to the Kiosk. Hollie did not have any natural lighting in her cell.

*Perry, Lee, Askew, Gray, Mcilvaine went onto property on Sept.7, 2019*

Plaintiffs re-alleges, and incorporates herein as set forth in full, paragraph 1-103, and Jurisdiction as if it was fully rewritten.

104. On the evening of September 7, 2020 Perry, Lee, Askew, Gray, McIlvaine went on to the property Plaintiff's dwelled on, which was approximately 250 yards into the woods, without a warrant and/or court order and without Plaintiff's consent or knowledge.

105. Upon information and belief Perry entered Plaintiff's greenhouse and hoop house without a warrant and without Plaintiff's consent and/or knowledge.

106. McIlvaine, Gray, and Askew entered Plaintiff's hoop house without a warrant and without Plaintiff's consent and/or knowledge.

107. Gray took pictures of Plaintiff's hoop house, outside buildings, outside structures, and refrigerator without a warrant and without Plaintiff's consent and/or knowledge.

108. Doe 11 opened Plaintiff's refrigerator and camper without a warrant and without Plaintiff's consent.

109. Defendant Lee entered the property Plaintiff's family dwelled on without a warrant and without Plaintiff's consent and/or knowledge, and assisted the other defendants. Lee did nothing to stop the other defendants from entering Plaintiff's barn, hoop house, green house, and refrigerator.

*Benton County, State of Tennessee forms a plan to seize Hollie*

Plaintiff re-alleges, and incorporates herein as set forth in full, paragraph 1-109, and Jurisdiction as if fully rewritten.

110. After Hollie arrived at the McIntosh County jail on September 7, 2019 Christina Lambright of the Benton County Sheriff's Office faxed a request that a detainer be put on Hollie to the McIntosh County Jail which Defendant Jessup granted the request without seeing any documentation to justify the detainer. Christina Lambright did not have in her possession any lawful document to justify making the request to Defendant Jessup.

111. On September 9, 2019 Christina Lambright relayed information she knew or should have known was false to Sgt. James Stenander of the McIntosh County Sheriff's office via teletype claiming that Hollie had previously failed to appear at a court hearing, when she had no evidence, witnesses or testimony that would show that there was even a court hearing to begin with. She also claimed that Hollie was a fugitive from Justice which resulted in a for 30 day committal order against Hollie in the McIntosh County Jail without Hollie having a hearing and without Hollie being allowed to see any documentation of any charges or allegations against Hollie denying Hollie of the right to due process.

112. Stenadner was negligent when he made no effort to verify that the information that Lambright relayed to him was true or not. Stenander swore under Oath to the same to a Judge without verifying that the information he was swearing to was true which caused Plaintiffs a damage.

113. On or about September 8, 2019 Vicky Lee swore to under Oath 3 affidavits against Hollie that she had no first-hand knowledge of any facts. Defendant Lee was negligent when she failed to perform her duty to verify that the information she was relaying to the Judge was true. Vicky Lee's actions resulted in 3 arrest warrants

being issued against Hollie which caused and continues to cause Plaintiff's a damage.

114.  On or about September 8, 2019 Vicky Lee swore to under Oath 1 affidavit against Patrick that she had no first-hand knowledge of any facts. Defendant Lee was negligent when she failed to perform her duty to verify that the information she was relaying to the Judge was true. Vicky Lee's actions resulted in 1 arrest warrant being issued against Patrick which caused and continues to cause Plaintiff's a damage.

115.  Plaintiff's had to post bond in the amount of $4800.00 to get released from jail on the charges that Vicky Lee swore to under Oath in front of the Judge when she had no first-hand knowledge of any facts.

116.  The warrants that Vicky Lee obtained against Plaintiff's on September 8, 2019 are still pending against Plaintiff's without a single hearing on the charges. The bond money is also being held by the Criminal Court Clerk for the County of McIntosh.

117.  On September 11, 2019 Sheriff Ken Christopher sent a fax to the McIntosh County Sheriff's Office of which released the detainer on Hollie which resulted in Hollie's release from the McIntosh County Jail on September 12, 2019.

118.  Approximately 45 minutes after Hollie was released from the McIntosh County Jail she was ambushed and seized, by approximately 5 officers, in the parking lot of said sheriff's office while she was sitting in a friends truck.

119.  Hollie was then re-arrested by Defendant Vicky Lee and Col. Danny Lowe without a warrant. Col. Danny Lowe, without consent, opened the door to the truck Hollie was in and Vicky Lee told Hollie "You need to step out". Hollie asked in plain language "Can I see the warrants" Col. Danny Lowe replied "It's on the way", Hollie replied" So you don't have the warrants" Col. Danny Lowe replied "Yeah we got it it's on the way" when neither Col. Danny Lowe or Lee had any warrants for Hollie's arrest.

120. Hollie was handcuffed by Lee, even though Hollie was not violent and was no risk of fleeing, and taken back to Solitary Confinement at the McIntosh County jail by a John Doe 6 under the watchful eye of defendant Jessup.

121. Hollie was held in solitary confinement at the McIntosh County Jail until the morning of September 13, 2019 when she was then transported by defendant Lee and Jane Doe 2 to Chattanooga Tennessee in handcuffs and leg restraints.

122. Patrick was held in the McIntosh County Jail from September 7, 2019 to September 9, 2019.

123. On September 13, 2019 Defendant Lee and Defendant Jane Doe 2 forced Hollie to walk into the gas station to use the bathroom in hand cuffs and leg restraints even though Hollie was not violent and was no risk of fleeing. After arrival in Chattanooga, Tennessee Lee and Jane Doe 2 handed Hollie over to John Doe 7 and Jane Doe 3. Jane Doe 3 placed hand cuffs and leg restraints on Hollie and John Doe 4 transported Hollie over 5 hours to Tennessee without verifying any documentation existed to lawfully allow them to do so, under the watchful eye of defendants Ken Christopher and Jessup. Hollie asked Lee and John Doe 4 to verify that they have the proper documentation to take custody of Hollie however they did not.

124. On September 13, 2019 under the watchful eye of defendant Ken Christopher Hollie was booked into the Benton County Jail and then transferred to the Carroll County Jail by John Doe 7 in handcuffs and leg restraints where Hollie was left in a cold cell for many hours without a phone call under the watchful eye of defendant Andy Dickson and Jane Doe 4.

125. In the Carroll County Jail, Hollie was housed with an extremely ill inmate in a cold cell with no blanket. Defendant Andy Dickson was negligent in his duty when he agreed to house Hollie without verifying that he had the lawful authority to do so. Defendant Does placed Hollie's name and information into their system before affording Hollie

a phone call even though Hollie had requested a phone call.

126. Does placed Hollie in General Population without affording Hollie a phone call. Which caused Patrick to not know Hollie's location for several hours.

127. On September 16, 2019 Hollie was transferred to the Houston County Jail in handcuffs and leg restraints by Jane Doe 5 where Hollie was deposited there until her release on October 4, 2019.

128. On September 16, 2019 Hollie spoke with defendant Kevin Scugg and informed him that she was there on an expired Capias and that she was being held and transferred there in retaliation of her filing a Federal Lawsuit on defendant Benton County. Defendant Kevin Scugg was negligent in his duty when he agreed to house Hollie without verifying that he had the lawful authority to do so. Defendant Kevin Scugg was negligent in his duty when he failed to investigate the circumstances of Hollie's incarceration after Hollie informed him she was being held unlawfully under the colour of law.

129. Jane Doe 6 medical professional at the Houston County Jail asked Hollie to sign a medical consent to treat however Hollie declined after Doe 6 stated she could not treat Hollie with any natural medicine even though it was against Hollie's religious beliefs to take pharmaceuticals. When Hollie came down with a toothache, from an infection, at the Houston County Jail she was denied natural medicine to battle her tooth infection by Jane Doe 7. Hollie was left to suffer from said toothache until her release.

130. Hollie was transported from Darien Georgia to Camden Tennessee, to Huntingdon Tennessee, to Erin Tennessee without any lawful extradition and/or detainer process and without even knowing the charges against her or even having a copy of the charging instrument even though she requested it several times.

131. Hollie finally received a copy of the charging instrument after she filed an inmate request with Houston County Jail Administration.

132.  According to the charging instrument Defendant Bolan accused Hollie of child neglect alleging that Hollie refused to consent to medical treatment for her son when it was Bolan that detained Hollie at the Benton County Jail on September 3, 2014 and refused to let her leave to go to the hospital with her son even though Hollie had not been charged with a crime and was not suspected of committing a crime.

133.  Defendants Ken Christopher and Lambright knew or should have known that the allegations Bolan made against Hollie were false because when Hollie's son was permanently removed from Hollie's care, and custody and placed with his grandmother in 2014 Hollie introduced audio recording evidence to defendant State of Tennessee agent, does, that proved that the allegations against her were false.

134.  Defendant Matthew Stowe and Alan Bolan knew or should have known that the allegations were unfounded however perused to sign and prepare documents outside of any court proceeding with the intent to prosecute Hollie and keep Hollie's son anyways. Alan Bolan acted with malice and intent to harm Hollie and her son in retaliation of Hollie refusing to speak with him.

135.  Hollie has not seen or heard from her son in 7 years due to the actions of defendants Matthew Stowe and Alan Bolan which has caused Hollie great emotional distress and 1000's of hours of legal research, work, and litigation costs that has left Hollie in a pit of despair.

136.  When Hollie was jailed in the McIntosh County Jail on the Capias sought out by defendant Stowe and Bolan, and the detainer requested by defendant Lambright Hollie was kept in solitary confinement for 2 days at the McIntosh County Jail. Hollie was forced to eat her food in her cell on her bed with a tray on her lap. Hollie was not given a small table or shelf and some type of seating arrangement was not provided to Hollie.

137.  While at the Carroll County Jail Hollie was exposed to disease when she was placed in a cold cell on a hard concrete bench with an extremely ill inmate. Hollie was forced to

stay in the cell for hours without any blanket whatsoever. Hollie's body suffered greatly from the cold and the cement bench, including but not limited to Hollie's body going numb, inflammation and pain in her buttocks, back and neck.

138. Hollie had no natural lighting in her cell while she was in solitary confinement at the McIntosh County jail September 8, 2019-September 13, 2019 and no natural lighting while she was at the Carroll County Jail from September 13, 2019 to September 16, 2019.

139. Hollie was denied access to Counsel while she was in the care, custody, and control of the McIntosh County Jail, and Houston County Jail under the watchful eyes of defendants Jessup, Ken Christopher, Andy Dickson, and Kevin Sugg.

140. Hollie was denied access to natural medical care for a toothache/infection by Jane Does while she was in the care, custody, and control of the Houston County Jail under the watchful eyes of defendants Ken Christopher, and Kevin Sugg.

141. Hollie was denied access to appropriate supplies, and services on her legal matter while she was in the care, custody, and control of the McIntosh County Jail under the watchful eye of defendant Jessup.

142. Hollie was denied access to appropriate supplies, and services to defend herself on her legal matters while she was in the care, custody, and control of the the Houston County Jail under the watchful eye of defendant Ken Sugg and Ken Christopher.

143. Hollie was denied access to appropriate supplies, and services on her legal matter while she was in the care, custody, and control of the Carroll County Jail under the watchful eye of defendant Andy Dickson.

144. Hollie had to go without meals while she was in the care, custody, and control of the Carroll County and Houston County Jails, under the watchful eyes of Dickson, and Ken Sugg, because (Does) would not provide her with meals without pork to accommodate her religious beliefs for several days. Hollie was forced to wear mingled

fabric clothing against her religious beliefs from the time she was incarcerated September 7, 2019 until she was released on October 4, 2019.

145.   Hollie did not have any outside recreation or exercise from September 13, 2019 until October 4, 2019 while she was in the care, custody, and control of the Benton, Carroll and Houston County Jails. Hollie had no control over the lighting that was in her cell from the time she was jailed on September 7, 2019 until she was released on October 4, 2019. Hollie did not have a desk or table, shelf, hooks or closet space, and chair or stool in her cell while she was being held in the McIntosh County and Houston County Jails.

146.   Hollie was denied access to staff officers at the Houston County jail to inform them that her meal contained pork. When Hollie called on the intercom she was told to not to buzz the intercom anymore by Jane Doe 8.

147.   While Hollie was at the Carroll County and Houston County Jail she was not provided with two sheets, one pillow, one pillow case and sufficient clean blankets to provide comfort under the cold temperatures she had to endure. Hollie was not given a towel while in the care, custody, and control of the Houston County Jail. Hollie had no access to natural soap or natural hair care products to coincide with her religious beliefs while Hollie was at the Carroll County and Houston County jails under the watchful eyes of Christopher, Dickson and Sugg. Hollie was forced to inhale toxic chemicals that was used for sanitary purposes which caused Hollie to feel nauseous and gave Hollie migraine headaches.

148.  Plaintiff's 7 month old daughter was deprived of Hollie's breast milk from September 7, 2019 until October 7, 2019 when she was finally able to get back to Georgia. By the time Hollie was released and arrived back in Georgia  Plaintiff's daughter would no longer take Hollie's breasts after the Defendant's gave Plaintiff's daughter a bottle.

149. Hollie lost over a year and a half of bonding time of breastfeeding her daughter. Plaintiff's daughter lost a year and a half of nutrition from Hollie's breast milk.

150. Hollie's milk production drastically dropped, and Hollie emotional distress from the stress of being arrested, and Hollie suffered from emotional distress from being held in solitary confinement, transported over 9 hours to Tennessee from Georgia in handcuffs and leg restraints and transferred jail to jail, and denied access to counsel and the appropriate resources to defend herself.

151. Plaintiff's suffered a loss of consortium and marital relations from September 7, 2019 to October 7, 2019 which caused Plaintiff's great emotional distress, anguish, and great frustration until they were finally able to get back to each other on October 7, 2019.

152. Hollie suffered great emotional distress, anguish and frustration from being falsely arrested and imprisoned and from being deprived of the services, counsel, resources, and material to defend herself in the Juvenile Case that was brought against her in Georgia that resulted in the wrongful removal of her two daughters L.R. and Y.R.

153. Hollie suffered great pain and discomfort from being forced to wear leg and hand restraints while being transported to Tennessee from Georgia. Hollie suffered mental anguish and great embarrassment from being led in handcuffs and leg restraints into the gas station in order to go to the bathroom.

154. While at the McIntosh County Jail Hollie was denied equal access to the phones, kiosk,shower, and law library as other inmates.

155. Judge Harold Webster III, under the watchful eye of Jessup, held a bond hearing on September 9, 2019 wherein he denied Hollie access to counsel and denied Hollie access to the law library and charging documentation after her request.

156. Harold Webster III, under the watchful eye of Jessup, signed 3 warrants against Hollie ex parte without her knowledge and without an opportunity to submit evidence, witnesses, and testimony even though upon information and belief Hollie was in the same building when the actions occurred. Judge Harold Webster III and defendant Jessup profit at the expense of prisoners under the colour of law.

157. Harold Webster III, under the watchful eye of Jessup, signed 1 warrants against Patrick ex parte without his knowledge and without an opportunity to submit evidence, witnesses, and testimony even though upon information and belief Patrick was in the same building when the actions occurred. Judge Harold Webster III and defendant Jessup profit at the expense of prisoners under the colour of law.

*Alicia Gray, Lashawnda Askew, Balbo, and James Chamberlins' further*

*involvement*

Plaintiffs re-alleges, and incorporates herein as set forth in full, paragraph 1-157, and Jurisdiction.

158. On September 7, 2019 Alicia Gray relayed information that she had no first hand knowledge of any facts to Judge Christy Balbo. Gray did nothing to verify the information to be true before she relayed the information to Balbo.

159. On September 9, 2019 Lashawnda Askew, practiced law without a license, when she filed a Petition in the Juvenile Court seeking custody of L.R. and Y.R. without verifying any facts and without the assistance of an attorney.

160. Judge Balbo acted without Jurisdiction when she proceeded to hear Defendant Askews' Petition that was wrongfully filed without the court or a person authorized by the court having determined and endorsed on the petition that the filing of the petition is in the best interests of the public and such child in compliance with GA Code § 15-11-150 (2019), Balbo when confronted with these facts, long after the date of filing said petition, applied her signature on the Petition as the endorsing party officer to

conceal the fact that Balbo acted without jurisdiction and outside any lawful authority.

161. On September 17, 2019 Balbo further acted without Jurisdiction when she proceeded to hear Askews' Petition after Patrick invoked his diplomatic immunity from state prosecution pursuant to 22 U.S.C. Section 254(b) and not limited thereto, which is extended to his family pursuant to 22 U.S.C. Section 254(d) and not limited thereto, when he filed and presented a Motion to Dismiss notifying Balbo that he is an Ambassador for the Kingdom of Y'Israel. Balbo claimed she did not have to recognize U.S.C. and proceeded anyways causing plaintiff's damage.

162. On October 15, 2019 Judge Balbo clothed with the authority of the state of Georgia acted under the colour of law, and without Jurisdiction, threatened Plaintiff's (at the McIntosh County court house) to continue the detainment of L.R. and Y.R., without cause, through the McIntosh County DFCS with the intent to compel Hollie and her husband to take a DNA test and other services against Plaintiff's religious beliefs for a profit for herself and the McIntosh County DFCS.

163. Christy Balbo further threatened Plaintiff's when she said Well Mr. Roether it appears you are fully willing to divorce your children. This proceeding can easily be turned into an adoption proceeding. These statements appear to be an intentional religious persecution against Plaintiff's and their children.

164. On or about September 9, 2019 Askew testified that she didn't believe Y.R. and L.R. would be in any danger if they were returned to Plaintiff's however Askew pursued to prosecute a court case, with the same baseless allegations against the Plaintiffs, and keep L.R. and Y.R. anyways.

165. On December 7, 2019 at approximately 11:16 a.m. while Y.R. was in the custody, care and control of the McIntosh County DFCS DOE 9 administered albuterol to Y.R. in direct contravention of Plaintiff's demand that no synthetic pharmaceuticals be given to L.R. and Y.R.

166. On December 7, 2019 Defendant John Ledwich III conducted an invasive medical procedure on Y.R. and along with Defendant's authorized the administration of albuterol to Y.R. without the consent and/or knowledge of Plaintiff's and against a court order not to administer any synthetic Pharmaceutical medications to L.R. and Y.R. without a court hearing/order.

167. No one sought or obtained a warrant or other similar court order authorizing Y.R.'s invasive medical procedures prior to the albuterol being administered. At no point in time did Defendants, especially SGMC, or anyone else, ever seek or obtain consent from Y.R.'s parents or a court to conduct these invasive medical procedures.

168. Upon information and belief Defendants John Ledwich III and SGMC performed the invasive medical examination at issue in this case pursuant to contract, and at the behest of McIntosh County and/or one or more of the other Defendant's. No one sought or obtained a warrant or other similar court order authorizing Y.R.'s invasive medical evaluations and testing prior to the examination and testing being conducted. At no point in time did Defendants, or anyone else, ever seek or obtain consent from Y.R.'s parents to conduct an invasive medical examination.

169. Upon information and belief the conduction of invasive medical examinations is a traditional governmental function. Upon information and belief Defendants SGMC and John Ledwich III regularly perform invasive medical examinations at the specific request of, and pursuant to contract with, Defendant McIntosh County, and or one or more the other defendant's, during juvenile dependency proceedings. In exchange for money, Defendants voluntarily collaborated with and jointly participated in the actions undertaken by McIntosh County DFCS social workers Alicia Gray and Lashawnda Askew in the underlying case, including the unwarranted and non-consensual invasive medical examination of Y.R.

170. *As* a general matter of practice and upon information and belief pursuant to contract, SGMC regularly follows directives and instructions given by McIntosh County DFCS social workers Alicia Gray and Lashawnda Askew which necessarily interfere with parents' custodial rights and/or rights to control the medical care of their children, without first requiring that a court order, warrant, or parental consent be sought or obtained.

171. SGMC does not train its staff regarding the constitutional rights that run between children and parents, or that a court order is required to conduct a non-emergency invasive medical examination of a child. None of the Defendants do anything to ensure that a court order or warrant permitting the invasive medical examinations of children in non-emergency circumstances has been issued, or that any parent has consented to such an examination - or even has knowledge of it.

172. In addition, none of these Defendants ever do anything to ensure that a court order or warrant permitting the administrative of synthetic pharmaceuticals to children has been issued, or that any parent has consented to such a procedure.

173. *As* a matter of custom, and practice the Defendants, and each of them, regularly conduct similar unwarranted invasive medical evaluations and procedures pursuant to contract and at the behest of McIntosh County on a continuous and regular basis for every child that is presented to SGMC by McIntosh County DFCS social workers or other law enforcement personnel.

*McIntosh County Social Workers threaten to continue to*

*detain L.R. and Y.R. if Patrick and Hollie do not do DNA testing and services*

Plaintiffs re-alleges, and incorporates herein as set forth in full, paragraph 1-173, and Jurisdiction.

174. Lashawnda Askew threatened Plaintiff's to continue to detain L.R. and Y.R. against their will if the Plaintiffs did not submit to DNA testing. Hollie was forced into

imprisonment and a limited visitation schedule that weaned Y.R. from being breast fed by her mother, Hollie, and severely affected their relationship and bonds with her children due to the unsupported, and knowingly unsupportable allegations by Defendants Lee, Chapman,Gray, and Askew of McIntosh County.

175.   On December 6, 2019 the McIntosh County DFCS informed Plaintiff's of their intentions of seeking to obtain a delayed certificate of birth for LaYah and YahCora over Plaintiff's religious objections.

176.   On November 12, 2019 at 11:19 p.m. defendant Askew informed Plaintiff's of her intentions of seeking leave to override Patrick and Hollie's religious objections to giving **Y.R.** dangerous pharmaceuticals in the stead of natural medicines. No emergency existed at the time. Plaintiff's informed Askew that they wanted to be apart of the conversation with Askew however were denied. Plaintiff's informed Askew that they wanted to give Y.R. natural medicine however were denied.

177.   Askew then went to Balbo, a Judge whom had recused herself from the case, for leave to give Y.R. pharmaceuticals. Balbo acted without Jurisdiction when she spoke with Askew and gave her consent to give Y.R. pharmaceuticals and take her to the hospital.

178.   Balbo continued to act without Jurisdiction when she signed Orders, in the Juvenile Court, after she recused herself from the case. Upon information and belief these Orders were used by McIntosh County DFCS to apply for Federal and State Funding.

179.   On October 8th, 2019 Patrick hand delivered Patrick's Notice of Claim to the McIntosh County Commissioner's Office located in Darien, Georgia, said claim is now numbered 625004747701.

180.   On October 23rd, 2019 Patrick hand delivered Hollie's Notice of Claim to the McIntosh County Commissioner's Office located in Darien, Georgia, said claim is now

numbered 625004747702.

181.   On October 29, 2019 the State of Georgia agency Department of Administrative Services Risk Management Services received Hollie's Notice of Claim however has failed to settle within 90 days as discussed in O.C.G.A. 50-21-1 et seq.

182.   On December 17, 2019 Plaintiff's children were returned to them under them by another Judge with an order that the Plaintiffs were to stay at 15120 Hwy. 82 Nahunta, Georgia which the requirement that Plaintiff's stay there was later vacated however Plaintiff's kept the right to peaceful possession of the house.

183.   Around September 2020 Isabella Amor, under the guise of "needing help", concocted a plan to attack Plaintiff's, for the purpose of unjust enrichment, when she sought information from the Plaintiff's concerning Child Welfare Proceedings.

184.   The Plaintiff's out of the goodness of their heart gave Amor knowledge of Child Welfare Proceedings and told her what they would do if they were in her situation.

185.   Amor claimed to have a ministry, Whos Yah Daddy Ministries, where people donate to the ministry and Amor outwardly appeared to disperse the funds and goods purchased as it was needed, while secretly living a lavish lifestyle.

186.   Amor occasionally brought Plaintiff's food, and clothing for Plaintiffs and their children that she claimed she had no use for, such as corn, and clothes her children had outgrown and some that she had found at thrift stores. Amor did this under the guise of "Who's Yah Daddy Ministries", "friendship" and what is "mine is yours".

187.   Patrick allowed Amor to stay a few days at the house in Nahunta as a guest and she visited Plaintiff's occasionally thereafter.

188.   Amor moved personal items into the house in Nahunta under the guise that she wanted "to sell them" to clear out her house in North Carolina to put it on the market.

189.   Plaintiff's went to Amor's house in North Carolina on or about November 21, 2020 for the purpose of helping her clean, repair a porch, and clear out some of belongings to

help her prepare her house to put on the market.

190. While the Plaintiff's were at Amor's house Amor became, including but not limited to, controlling, manipulative, had a sense of entitlement and attempted to make the Plaintiffs fast so she didn't have to go buy more groceries and due to some type of lunar occurrence. Plaintiffs became very uncomfortable with the defendant at this time.

191. The Same evening Amor asked Patrick to move her SUV behind his truck because she was afraid that the neighbor would mess with her car because she believed that they had a key to it.

192. Patrick unloaded his truck that had some of her belongings on it to accommodate her request. Patrick covered up Almors belongings to protect them from the elements.

193. Early the next morning the Plaintiffs left and went to a friend's house because he was uncomfortable with the Defendant at this time.

194. Patrick suggested to the Defendant, via text message, that she should put her stuff back in the house so it would not get damaged. The Defendant replied that she wasn't going to work on the Sabbath.

195. Patrick after much thought and after speaking with Amor decided it was no longer a good idea for Amor to have her things in the house located in Nahunta.

196. On or about November 29, 2020 Patrick, with 4 witnesses present via phone conference, told the defendant to remove her belongings from the house in Nahunta.

197. Amor kept telling the Plaintiffs that she was going to remove her property from the house located in Nahunta however she never did.

198. The Plaintiffs gave grace upon Amors' request in removing her belongings because the Defendant was having personal problems and the house was vacant.

199. The Defendant told the Plaintiffs over and over that she was getting her stuff out of the house, having it cleaned and would repair the damages however never did, wherein Plaintiffs gave Defendant grace as requested.

200. On or about April 8, 2021 Amor started an unwarranted disagreement between Patrick and Hollie. Amor that she kept manipulating and instigating Patrick and Hollie with the intent to intensify the disagreement. At this time Plaintiff's asked Amor to leave.

201. On or about April 8, 2021 Defendant again told Patrick of her intentions of getting her personal belongings out of the house in Nahunta however never did.

202. Defendant Amor, On June 3, 2021 then gave Plaintiff's notice of her will that: "I am not planning to stay there anymore. I am selling all my material possessions and leaving usa."

203. On August 12, 2021 the owner of the house in Nahunta called the Plaintiffs and told the Plaintiffs that everything needed to be out of the house in Nahunta by Monday August 16, 2021  because she was putting the house on the market and the realtor was scheduled to come on Tuesday August 17, 2021.

204. As soon as the Patrick got off the phone with the home owner he messaged Defendant Amor and let her know that the owner of the house in Nahunta was putting the house on the Market and that she would need to remove anything she had in the house by Monday August 16, 2021. Amor responded, "I was a tenant there, I will need 30 days to get all the things out."

205. Plaintiff's did not hear anything from Amor to arrange a time to meet Plaintiff's there to get her belongings so Patrick packed Amor's belongings put them in her trailer went and purchased a tarp covered them and informed Amor that the things were waiting for her to come get and they needed to be picked up by Friday at 8:00 a.m. or they will be disposed of.

206. On August 19, 2021 Amor allegedly flew to Georgia and her "guitar player" allegedly picked her up.  Amor and her guitar player met Patrick around 4:00 p.m. to pick up her Cadillac engine that she wanted Patrick to fix so it could be sold. Patrick informed Amor and her guitar Player not to go into the house and to leave the key under

the mat in the van. Amor claimed she didn't have a key.

207. Amor, after her arrival at the house in Nahunta became upset and started making excuses as to why she couldn't hook the trailer up. Patrick, tired of her endless excuses, sternly told her how it was and how Amor damaged the property and took advantage of him and his wife and told Amor to get the items off the property. She said okay I will get them off the property and that she was going to call Mary a friend of hers for help.

208. The Plaintiff's did not hear anything further from Defendant Amor until around 8:42 p.m. on August 19, 2021 when someone the Plaintiffs believed to be Ben an acquaintance of theirs called.

209. Defendant Ben did not identify himself as an officer or deputy Sheriff, nor did he use his full name. After Patrick had several minutes of conversation with whom Plaintiff's believe to be Defendant Bennett Hollie became suspicious of who he was actually talking to and told Patrick that he needed to confirm who he was talking to. It was at this time that he learned that he was talking to whom they thought was a Tim a deputy at the Brantley County Sheriff's department whom upon information and belief was actually defendant Wade Bennett.

210. The Plaintiffs tried to explain to the defendant during their 26 minute conversation that Amor was not a tenant at that house and didn't live there however defendant Bennett was not hearing anything that the Plaintiffs were saying and advised Plaintiffs that it would be up to Amor if she wanted to take a criminal warrant out against Patrick. Patrick advised Tim that he wanted to make a report against Amor for filing a false police report of which Tim laughed at Patrick and did not take such report.

211. The morning of August 20, 2021 Amor started sending Hollie unwanted messages. Hollie replied to Amor's text messages and told her to stop messaging her. However Amor did not stop messaging Hollie.

212. The morning of August 20, 2021 Patrick went to the Brantley County Magistrates

court to obtain an application for an arrest warrant on Amor for making a false police report and for harassment. Patrick was also going to apply to the Magistrate for a restraining order against Amor.

213. Upon Patrick's arrival at the Brantley County's Magistrates Court defendant Simpson interfered with Patrick reporting Amor's crimes when he arrested Patrick on charges of Criminal Damage to Property in the second degree. Simpson would not let Patrick report Amors crimes to a Judicial Officer.

214. Isabella Amor appeared to work in concert with the Defendant's to intentionally cause havoc in Plaintiffs lives and interfere with the Plaintiff's peaceful right to possession of the property at 15120 Hwy. 82 Nahunta, Georgia, when she called the Brantley County Sheriff's Department and made allegations against Patrick with the intent to injure him and have him falsely arrested and imprisoned so she could take possession of the property.

215. Upon information and belief on the night of August 20, 2021 Amor knowingly, willfully, with forethought, and malice, and with the intent to cause harm to Plaintiffs, told Defendant Bennett that Patrick was her landlord and that she gave Patrick food and clothing in exchange for rent for the house located at 15120 Hwy. 82 Nahunta, Georgia.

216. According to Defendant Bennetts police report Armor told Defendant Bennett that Patrick placed her personal property outside uncovered exposed to the rain and the elements which caused a damage to her property over $5000.00..

217. Amor knew or should have known that the information she relayed to Defendant Bennett was false because she knew that;

    A. Patrick was not the owner of the house and that she didn't have a rental contract and/or agreement with Patrick or the owner.

    B. Patrick had bought a brand new tarp to cover the trailer.

218. Defendants Amor and Bennett knew or should have known that no

landlord/tenant relationship existed between Patrick and Amor. Defendant Amor also knew that Patrick did not damage any of Amors property nor did he leave any of Amor's property exposed to rain and/or the elements as she alleged.

219. Amor knew Patrick had purchased a brand new tarp to cover the property that Amor had willfully left in the house and refused to come get for months at a time.

220. Patrick asked Amor to leave the new tarp and his straps under a Pallet in the yard.

221. Amor and Bennett entered into an agreement to have Patrick arrested on criminal Damage to Property charges. Amor agreed to further the agreement and testify against Patrick .

222. Bennett furthered the agreement when he relayed information to Simpson who Swore on a document entitled State Warrant that Patrick committed the offense of Criminal Damage to Property in the 2nd degree when "accused executed an illegal eviction"

223. On August 20, 2021 Patrick, (upon arrival at the Brantley County Magistrate Court) was arrested by Simpson. Simpson while exercising his duties that are authorized by law and clothed in the authority of a law enforcement officer breached his duty when he neglected the command of Magistrate Anita R. Crews` order to take Patrick before a judicial officer, instead Chief Deputy sent Patrick to the BRANTLEY COUNTY JAIL and Patrick was never brought before a Magistrate/Judge to see if a warrant should issue and denied Patrick of his 4th and 5th amendment rights as those rights apply to Patrick.

224. Simpson refused to give Patrick the charging instrument after Patrick requested it.

225. Amor, Simpson, and Bennett's actions caused great emotional damages to Plaintiffs and their children specifically L.R. who cried and said she was scared she was going to get taken away again, scared of her dad being in handcuffs, sad because her dad wasn't on the boat with her and Scared that her mom might be taken too.

226. Amor, Simpson, and Bennett's actions where willful, intentional, and with Malice.

227. Unknown named Does then took Patrick's fingerprints against his will and without a court order, after threatening Patrick that he would never be able to go before a judge to get out of jail, even though they didn't need them for identification and didn't have probable cause to take them.

228. Later that day on August 20, 2021 around 3:00 p.m. Patrick was taken before a Judge for a bond hearing, however did not have access to the allegations against him or the charging instrument, was not able to call witnesses, submit evidence and/or provide testimony on the charges that were against him. Nor was he able to face his accuser (Defendant Amor).

229. Amor continued to send Hollie unwanted messages and threatened Hollie and her children when she said in part; " You and Patrick have costed me over 10k in damages to my NC furniture" "You physically abused me", "You truly have some evil spirits in you", "If I was you and the girls would not be on the boat right now!"

230. Hollie did not entertain Amor's messages as Hollie knew Amor had a history of provoking people to anger and then recording it and using it against people to intimidate them. Amor then publishes parts of the actions with the intentions of receiving public sympathy an in return get monetary donations under false pretenses.

231. Amor, Chief Executive Officer, of "Who's Yah Daddy's Ministries" has a policy, custom, and institutionalized practice of acting as she feeds the homeless, and clothes the naked, whom befriends people, and then uses them for her own benefit, after she uses them to get what she wants she provokes them to anger and then uses the persons reaction to put on the internet, wherein she ask for prayers and sympathy with the primary goal to get more money out of people to live her lavish lifestyle.

232. Amor, acting in concert with Simpson, and Bennett, under the watchful eye of Davis, when she took possession of the house located at 15120 Hwy. 82 Nahunta, Georgia from August 20, 2021 to August 26, 2021, causing Plaintiff's a damage

FIRST CLAIM - Violation of Civil Rights (42 U.S.C. §1983)

COUNT1
(Procedural Due Process, Unlawful Seizure, Invasion of Privacy, and
Interruption of Familial Association/Failure to Intercede)
By PLAINTIFF'S Ambassador Patrick and Hollie Roether
Against Defendants, GRAY, ASKEW, CHAPMAN, GONZALEZ, BRENNAN, PERRY,
JESSUP, CHAMBERLIN, LOWE
and DOES 1 through 100, inclusive

Plaintiff's incorporate the above allegations of fact and law as though fully set forth herein including 1-232 and Jurisdiction.

233. Plaintiff Patrick Roether is an Ambassador for the kingdom of Y'Israel protected and recognized by including but not limited to Public Law 97-280, Act of Congress, Second Corinthians 5:20, 8 U.S.C. §1481, 22 U.S.C. §254(b), 18 U.S.C. §1116(6)(3)(a) and (b), 18 U.S.C. § 1201(a) and (b), and the Vienna Convention. Chamberlin, Askew, and Gray did not release Y.R., and L.R., within 24 hours of notice by Patrick Roether of his Ambassador and diplomatic immunity status.

234. At all times relevant herein, the right to familial association guaranteed under the First and Fourteenth Amendments to the bill of Rights and the United States Constitution was so very "clearly established" that any reasonable social services agent and/or police officer or other law enforcement officer in Defendants' situation would know it is unlawful to seize a child from the care, custody, and control of his or her parents or to question, threaten, examine, or search a child in the absence of exigent circumstances without first obtaining a warrant to do so. Furthermore, any such reasonable social worker and/or police officer would know that to do so would constitute a violation of the parents', and children's, well- elaborated constitutional right to live together without governmental interference -which rights are protected under the First and Fourteenth Amendments to the Bill of Rights and the United States Constitution.

235. Defendants, and each of them, had, at all times relevant herein, an affirmative duty

and obligation to recognize, acknowledge, and respect the Plaintiffs' rights, and to conduct themselves in a manner that confirms, provides for the preservation of, and does not violate the rights guaranteed Plaintiffs under the United States Constitution, including, without limitation, the protection of parental rights, the right to privacy, family integrity and the right to familial relations.

236. Defendants, and each of them, at all relevant times herein were acting under color of state law when they jointly acted, or knew and agreed and thereby conspired, to violate Plaintiffs' constitutional rights by, but not limited to, removing, detaining, and continuing to detain L.R. and Y.R. from the care, custody, and control of their parents, without proper or just cause and/or authority, in the absence of any exigency, and without first obtaining a warrant or other court order - thereby violating Plaintiffs' rights under the First, Fourth and Fourteenth Amendments to the Bill of Rights and the United States Constitution.

237. None of the Defendants sought, or obtained, a protective custody warrant - or any other type of warrant or court order, prior to seizing L.R. or Y.R. Defendants, and each of them, jointly acted or conspired to seize both children, as described above, knowing that no warrant authorizing either child's seizure issued and that exigent circumstances did not exist. They also knew that neither parent consented to said unwarranted seizure.

238. At no time ever did any of the Defendants have any specific, articulable evidence to support any reasonable basis to believe that any of Plaintiffs' children were in immediate danger of sustaining serious bodily injury or death within the time it would have taken the Defendants to seek and obtain a warrant authorizing the children's seizure. Indeed, Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, purposefully, knowingly, and/or recklessly failed to seek a warrant, in knowing contravention and derogation of Plaintiffs' clearly

established rights to due process and familial association.

239.  In the alternative, with respect to Defendant LOWE, through his extensive training as a Corporal for the McIntosh County Sheriff's Department, on information and belief, he was aware of the aforementioned constitutional rights of parents and children to live together without government interference. On information and belief, he was equally aware through his training and experience that he had an affirmative obligation to intercede and intervene to protect the rights of an Ambassador and his family, like Plaintiffs, when he witnessed constitutional rights being violated by other government agents. Not only did he stand by and fail to intercede and intervene on Plaintiffs' behalf- he went so far as to participate, provide agreement, concurrence, and armed support for PERRY, ASKEW, CHAPMAN, LEE, and GRAY when together they seized L.R. and Y.R.

240.  In the alternative, with respect to CHAPMAN, through his extensive training as a Sergeant for the McIntosh County Sherriff's Department, on information and belief, he was aware of the aforementioned constitutional rights of men and women to the right of life, liberty, and the pursuit of happiness without government interference. On information and belief, he was equally aware through his training and experience that he had an affirmative obligation to intercede and intervene to protect the rights of an Ambassador and his family, like Plaintiffs, when he witnessed constitutional rights being violated by other government agents. Not only did he stand by and fail to intercede and intervene on Plaintiffs' behalf - he went so far as to order participate, provide agreement, concurrence, and armed support for PERRY when together they assaulted Hollie and Y.R. and seized Y.R., Hollie and Patrick without a warrant and in the absence of any exigency.

241.  In the alternative, with respect to Criminal Investigator LEE, through her extensive training as a detective/Criminal Investigator, on information and belief,

she was aware of the aforementioned constitutional rights of parents and children to live together without government interference, and the constitutional rights of men and women to life, liberty, and the pursuit of happiness without government interference. On information and belief, she was equally aware through her training and experience that she had an affirmative obligation to intercede and intervene to protect the rights of an Ambassadors family, like Plaintiffs, when she witnessed their constitutional rights being violated by fellow officers. Not only did she stand by and fail to intercede and intervene on Plaintiffs' behalf - she went so far as to provide agreement, concurrence, and support for PERRY, LOWE, CHAPMAN, ASKEW and GRAY when together they seized Patrick, Hollie, L.R. and Y.R. without a warrant and in the absence of any exigency.

242. In the alternative, with respect to Deputy PERRY, through his extensive training as a sheriff's deputy, on information and belief, he was aware of the aforementioned constitutional rights of parents and children to live together without government interference. On information and belief, he was equally aware through his training and experience that he had an affirmative obligation to intercede and intervene to protect the rights of an Ambassadors family, like Plaintiffs', when he witnessed their constitutional rights being violated by fellow officers. Not only did he stand by and fail to intercede and intervene on Plaintiffs' behalf - he went so far as to provide agreement, concurrence, and armed support for CHAPMAN and GRAY when together they seized L.R. and Y.R. without a warrant and in the absence of any exigency.

243. No reasonable government agent in Defendants' position could have believed that their conduct, i.e., agreeing to and supporting and/or failing to intercede or intervene to stop the unwarranted assault seizure of Plaintiffs' children, under the circumstances then presented was lawful.

244. As a direct and proximate result of these Defendants' misconduct, Plaintiff has

suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety, emotional distress, pain and anguish, loss of consortium deprivation of bonding and breast milk among other things.

245.   Due to the malicious, wanton, callous, reckless, wrongful and despicable nature of the Defendants' misconduct, as herein alleged and described, Plaintiffs are entitled to recover, and shall seek, punitive damages against the individual Defendants, and each of them, in accordance with law and subject to proof at trial. Defendants stated herein this Claim arrested Plaintiffs without a warrant, trespassed on Plaintiff's property, broke into Plaintiff's house, camper, barn, and Plaintiff's other outside structures and took pictures all without a warrant, having a duty to know the law however, failed to adopt rules and guidelines or to exercise supervision over local social services agency and said failures led to deprecation of Plaintiff's child custody of L.R and Y.R without a court hearing in violation of due process under the color of state law of which is sufficient to state a claim for monetary relief against Defendant(s) and state authorities.

### COUNT 2
(Deprivation of Constitutional Rights - Non-Consensual and Unwarranted
Invasive Medical Examination and Treatment)
By PLAINTIFFS Ambassador Patrick and Hollie Roether
Against Defendants, Chamberlin, Collipp, Ledwich III, SGMC,
and DOE 9, Social Worker Doe 10, and DOES 1 through 100, inclusive

Plaintiffs Ambassador Patrick and Hollie Roether incorporates the above allegations of fact and law as though fully set forth herein including 1-245 and Jurisdiction.

246. At all times relevant hereto, the constitutional right to remain free of non-consensual intrusive medical examinations and treatment was "clearly established" such that any reasonable person in Defendants' circumstances would know that it is a violation of the parents' constitutional rights to subject their child to a medical

examination and treatment without just cause, parental consent, or a court order/warrant authorizing the examination and treatment. See (In re Aviles 59 B.R. 138,139 Bankr. S.D. Fla. 1986) "Therefore, a wrongful act done intentionally which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury."

247. Defendants Collipp, John Ledwich III, Doc 1, SGMC, and each of them, performed the invasive medical examination of L.R., and Y.R. at issue in this case. No one sought or obtained a warrant or other similar court order authorizing L.R. and Y.R.'s invasive medical evaluations prior to the examination being conducted. At no point in time did Defendants, or anyone else, ever seek or obtain consent from L.R., and Y.R.'s parents to conduct an invasive medical examination.

248. Y.R. was subjected to invasive medical examinations, including extracting Y.R.'s bodily fluids, at SGMC without the consent, knowledge, or presence of either Plaintiffs. These examinations were performed by John Ledwich III at the request of Social Worker Doc 10. Defendants John Ledwich III and SGMC performed the forensic medical examination, a traditional government function, at issue in this case pursuant to contract, and at the behest of McIntosh County. There was no reasonable basis to conduct an invasive medical examination on Y.R.

249. L.R. and Y.R. was subjected to invasive medical examinations, including extracting L.R.'s and Y.R.'s bodily fluids, under the care of Collipp without the consent, knowledge, or presence of Plaintiffs. Upon information and belief these examinations were performed by Collipp at the request of Social Worker Doc 10.

250. Defendants Collipp performed the forensic medical examination, a traditional government function, at issue in this case pursuant to contract, and at the behest of McIntosh County. There was no reasonable basis to conduct an invasive medical examination on L.R. and Y.R.

251. No reasonable agent in Defendants' position could have believed that their conduct, i.e., agreeing to and supporting the warrantless invasive medical examination and treatment of L.R. and Y.R. under the circumstances then presented, was lawful.

252. As a direct and proximate result of these Defendants' misconduct, Plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety and anguish, digestive tract issues, among other things.

253.   Due to the malicious, wanton, callous, reckless, wrongful and despicable nature of the Defendants' misconduct, as herein alleged and described, Plaintiffs are entitled to recover punitive damages against the individual Defendants, and each of them, in accordance with law and subject to proof at trial.

## COUNT 3
### (Deprivation of Constitutional Rights - Non-Consensual UnwarrantedMedical Procedures - Administering of Albuterol) By PLAINTIFFS Ambassador Patrick and Hollie Roether Against Defendants, SOCIAL WORKER DOE 10, DOE 9, and DOES 1 through 100, inclusive

Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein including 1-253 and Jurisdiction.

254. At all times relevant hereto, the constitutional right to remain free of non-consensual intrusive medical procedures was "clearly established" such that any reasonable person in Defendants' circumstances would know that it is a violation of the parents' constitutional rights to subject the child to synthetic pharmaceuticals, such as albuterol, without just cause, parental consent, or a court order/warrant authorizing the procedure. See Wallis ex rel. Wallis v. Spencer, 202 F.3d 1126, 1141-1142 (9th Cir. 1999). "Parents have a guaranteed constitutional right arising from the liberty interest in family association to be with their children while they are receiving

medical attention or undergoing medical procedures. Id. at 1142. This constitutional right to familial association includes the right of parents to make important medical decisions for theirchildren. Id. at 1141."

255. Defendants Doctor Doe 1, Nurse Doe 9, Social Worker Doe 10, and each of them, performed the administration of the synthetic pharmaceutical, Albuterol, at issue in this case. No one sought or obtained a warrant or other similar court order authorizing Y.R.'s invasive medical procedures prior to the Albuterol being administered. At no point in time did Defendants, or anyone else, ever seek or obtain consent from Y.R.'s parents to conduct any of the administration of Albuterol.

256. Y.R. was subjected to invasive medical procedures, including the administration of Albuterol, without the consent or presence of the Plaintiffs. These examinations were performed by Doctor Doe 1 and Nurse Doe 9 at the request of Social Worker Doe 10.

257. Social Worker Doe 10 never notified Plaintiffs prior to the procedure where or when  the albuterol would be administered. At this time, Y.R. was supposed to be receiving' natural medicine and was not in need of any medical attention.

258. Defendants Doctor Doe 1, Nurse Doe 9, and each of them, performed the unwarranted administration of albuterol and extraction of Y.R.'s bodily fluids, an invasive medical procedure, at issue in this case pursuant to contract, and at the behest of McIntosh County. There was no reasonable basis to perform these procedures on Y.R.

259. No reasonable agent in Defendants' position could have believed that their conduct, i.e., agreeing to and supporting the administering of Albuterol performed on  Y.R. without parental consent under the circumstances then presented, was lawful.

260. As a direct and proximate result of these Defendants' misconduct, Plaintiffs

have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety and anguish, among other things.

261. Due to the malicious, wanton, callous, reckless, wrongful and despicable nature of the Defendants' misconduct, as herein alleged and described, Plaintiffs are entitled to recover punitive damages against the individual Defendants, and each of them, inaccordance with law and subject to proof at trial.

## COUNT4
### (Procedural Due Process, Unlawful Entry on property, Invasion of Privacy, and Failure to Intercede)
### By PLAINTIFFS Ambassador Patrick and Hollie Roether
### Against Defendants, GRAY, ASKEW, LEE, PERRY, MCILVAINE,and
### DOES 1 through 100, inclusive

Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein including 1-261 and Jurisdiction.

262. As stated herein Plaintiff's husband is an Ambassador for the Kingdom of Y'Israel and a Citizen of the Kingdom of Y'Israel living on Georgia within the confines of McIntosh County, is protected by the laws of the State of Georgia, as well as those of the United States Constitution, including the Fourth and Fourteenth Amendments thereto.

263. As stated herein, Defendants, and each of them, have wrongfully, unlawfully, and with deliberate indifference to the rights of Plaintiffs, and with utter disregard of Defendants' duties and obligations to Plaintiffs, acted, practiced and/or adopted policies, practices, procedures and/or customs which are in violation of the rights of Plaintiffs, including those to be free from governmental interference as to Plaintiff's privacy and familial associations, and from unreasonable searches or seizures, including those relating to child abuse allegations and related actions and proceedings.

264. At all times relevant herein, the right to privacy guaranteed under the First and Fourteenth Amendments to the United States Constitution was so very "clearly established" that any reasonable social services agent, and/or attorney, and/or police officer or other law enforcement officer in Defendants' situation would know it is unlawful to go onto someone else's property in search of evidence in the absence of exigent circumstances without first obtaining a warrant to do so. Furthermore, any such reasonable social worker, and/or attorney, and/or police officer would know that to do so would constitute a violation of the families well- elaborated constitutional right to privacy without governmental interference -which rights are protected under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

265. Defendants, and each of them, had, at all times relevant herein, an affirmative duty and obligation to recognize, acknowledge, and respect the Plaintiffs' rights, and to conduct themselves in a manner that confirms, provides for the preservation of, and does not violate the rights guaranteed Plaintiffs under the United States Constitution, including, without limitation, the right to privacy, and family integrity.

266. Defendants, and each of them, at all relevant times herein were acting under color of state law when they jointly acted, or knew and agreed and thereby conspired, to violate Plaintiffs' constitutional rights by, but not limited to, entering the property Plaintiffs and their family dwelled on in search of evidence without proper or just cause and/or authority, in the absence of any exigency, and without first obtaining a warrant or other court order - thereby violating Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

267. At no time ever did any of the Defendants have any specific, articulable evidence to support any reasonable basis to believe that the warrantless entry was shown to be with

exigent circumstances because there was no need to worry about destruction of evidence from the beginning of the foray onto the property and there was no safety concern. The destruction of evidence rationale for exigency is more compelling in drug cases, but this isn't. There was no readily foreseeable evidence to be destroyed before a warrant could be obtained within the time it would have taken the Defendants to seek and obtain a warrant authorizing entry onto the property, including but not limited to the structures thereon. Indeed, Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, purposefully, knowingly, and/or recklessly failed to seek a warrant, in knowing contravention and derogation of Plaintiffs' clearly established rights to due process and the right to privacy.

268. None of the Defendants sought, or obtained, a search warrant - or any other type of warrant or court order, prior to entering the property and structures on the land that Plaintiffs dwelled on. Defendants, and each of them, jointly acted or conspired to seize pictures of Plaintiffs property, as described above, knowing that no warrant authorizing the entry or seizure of pictures issued and that exigent circumstances did not exist. They also knew that neither the Plaintiff's or the land owner consented to said unwarranted entry and seizure.

269. As a direct and proximate result of these Defendants' misconduct, Plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety and anguish, Humiliation, invasion of Privacy.

270. Due to the malicious, wanton, callous, reckless, wrongful and despicable nature of the Defendants' misconduct, as herein alleged and described, Plaintiffs are entitled to recover punitive damages against the individual Defendants, and each of them, in accordance with law and subject to proof at trial.

COUNT 5
**(Substantive Due Process, The Right to be Free From the Use of Deception in
Judicial Proceedings, and Familial Association)
By PLAINTIFFS Ambassador Patrick and Hollie Roether
Against Defendants, GRAY, ASKEW, BALBO, CHAMBERLIN and
DOES 1 through 100, inclusive**

Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein including 1-270 and Jurisdiction.

271. Plaintiffs are informed and believes and therein alleges that the right to familial association guaranteed under the Fourteenth Amendment is "clearly established" such that a reasonable social worker in defendants' situation would know it is unlawful to remove a child from the care, custody, and control of its parents absent exigent circumstances. In addition, there is a clearly established due process right not to be subjected to false accusations on the basis of false evidence that was deliberately fabricated by the government such that a reasonable social worker in Defendants' situation would know it is unlawful to lie, fabricate evidence, and/or suppress exculpatory evidence in sworn petitions, court reports or Juvenile Dependency Petitions filed with the court.

272. In doing the things alleged hereinabove, Defendants and each of them, interrupted and impaired the familial rights of Plaintiffs by unlawfully removing L.R. and Y.R. from the custody and care of their father and their mother and continued to detain them despite their knowledge that they were removed and detained based on Defendant's lies, suppressions, and fabrications. As to defendant Chamberlin, he knew, intentionally, and voluntarily collaborated with the remaining defendants, and each of them, in effectuating their unlawful scheme/plan to keep Plaintiffs daughter's from the care, custody, and control of the Plaintiffs, their mother and father, and out of her family home for as long as possible.

273. In doing the alleged hereinabove Defendants and each of them were acting under the colour of state law. They did these things without proper justification or authority,

and without probable cause, or exigency. Further Defendant's actions were taken with deliberate indifference to Plaintiffs due process rights and/or rights to uninterrupted familial association and/or privacy. As to Chamberlin, his conduct was also undertaken in direct breach of his fiduciary duties to his clients McIntosh County DFCS.

274. Defendant's and each of them maliciously conspired to violate the civil rights of the Plaintiffs, including violation of the Plaintiffs rights found in the Fourteenth Amendment of the United States Constitution, by, but not limited to, removing, detaining, and continuing to detain Plaintiffs daughter's without proper or just cause and/or authority; by subjecting Plaintiffs daughter's to physical examinations without consent, authority, or the presence of their parents; by the use of coercion and duress to obtain evidence and testimony; and by maliciously falsifying evidence, and presenting fabricated evidence to the court, and maliciously refusing to provide exculpatory evidence of the dependency proceeding in violation of O.C.G.A. § 16-10-20, and violating the Constitutional rights of Plaintiffs.

275. By these actions, Defendants, and each of them, interfered and/or attempted to interfere with Plaintiffs constitutional rights to familial association under the Fourteenth Amendment.

276. As the direct and proximate result of these Defendant's actions, Plaintiffs have suffered, and will continue to suffer economic, physical, mental, and emotional injury all to an extent and in an amount to subject to proof at trial.

277. On information and belief, Defendant, and each of them acted with malice and with the intent to cause injury to Plaintiffs, or acted with a willful and conscious disregard of the rights of the Plaintiffs in a despicable, vile, and contemptible manner. Therefore, Plaintiffs are entitled to an award of Punitive damages only against the individual defendants for the purpose of punishing them and to deter them and others from such conduct in the future.

### COUNT6
### (Declaratory Judgment)
### By PLAINTIFFS Ambassador Patrick and Hollie Roether
### Against all defendants and DOES 1 through 100, inclusive

Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein including 1-277 and Jurisdiction.

278. As stated herein, Defendants, and each of them, have wrongfully, unlawfully, and with deliberate indifference to the rights of Plaintiffs, and with utter disregard of Defendants' duties and obligations to Plaintiffs, acted, practiced and/or adopted policies, practices, procedures and/or customs which are in violation of the rights of Plaintiffs, including those to be free from governmental interference as to her privacy and familial associations, and from unreasonable searches or seizures, including those relating to child abuse allegations and related actions and proceedings.

279. Defendants have failed to acknowledge their improper, unlawful and unconstitutional actions, conduct and policies at the time of the incidents at issue in the present action, and Plaintiffs are informed and believes, and on that basis alleges, that presently Defendants have not changed or modified such actions, conduct and/or policies to conform to law despite several warnings from appellate courts to do so.

280. Defendant's wrongful and unlawful conduct, actions and/or policies, unless and until forced to promulgate policies, by order of this court, will cause, and continue to cause, great and irreparable injury to Plaintiffs, and other individuals and citizens, in that Defendants will continue to act in accordance with said unlawful policies, and with deliberate indifference to their duties and obligations under state and federal law, including those under the Fourth and Fourteenth amendments as alleged herein above.

281. Based on information and belief, Plaintiffs allege that as presently applied by the County of McIntosh, McIntosh County DFCS and Georgia Department Human Services, Georgia Department of Health and Human Services Division of Family and Children's Services those portions of the Welfare and Institutions Code of which County of McIntosh et. al claims allow the misconduct set out above are unconstitutional in the way they are applied pursuant to the regularly established customs, policies, and practices of the County of McIntosh et. al..

a. Plaintiffs have no adequate remedy at law to prevent or prohibit Defendants from continuing, and/or repeating, their unlawful and unconstitutional conduct and policies other than through injunctive relief, and therefore seek an order directing the County of McIntosh et. al to promulgate policies and implement training to prohibit its social workers from, but not limited to, the following;

A. Detaining and/or removing children from their family and homes without exigent circumstances (imminent danger of serious physical injury), court order and/orconsent;

B. Removing children from the care of their family and from their homes without first obtaining a warrant when no legally recognized exigency exits;

C. Examining children without exigency, need, or proper court order, and without the presence of their proper custodian and/or guardian;

D. Removing and detaining children, and not returning them, beyond a reasonable period after the basis for detention is negated.

E. Using trickery, duress, fabrication and/or false testimony or evidence, and in failing to disclose exculpatory evidence, in preparing and presenting reports and court documents to the Court; and

F. Acting with deliberate indifference to the constitutional protections guaranteed to individuals, including those under the Fourth and Fourteenth Amendments, when

performing actions related to child abuse and dependency type proceedings.

G. Aiding and abetting in the violation of civil rights guaranteed to individuals, including those under the Fourth (protecting against invasion of autonomy privacy) Amendments, by engaging in the aforementioned conduct;

H. Conspiring to violate civil rights guaranteed to individuals, including those under the Fourth (protecting against unreasonable search and seizure) and Fourteenth (protecting against invasion of autonomy privacy) Amendments, by engaging in the aforementioned conduct.


### COUNT 7
(Procedural Due Process, Unlawful Seizure, Invasion of Privacy, and Interruption of Familial Association/Failure to Intercede, Slander, Libel, defamation, )
By PLAINTIFF'S Ambassador Patrick and Hollie Roether
Against Defendants, AMOR, DAVIS, BRANTLEY COUNTY SHERIFFS OFFICE, SIMPSON, BENNETT
and DOES 1 through 100, inclusive

Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein including 1-281 and Jurisdiction

282. Amor, Davis, Simpson, Bennett made unjustified and unwarranted decisions about Patrick based on allegations that had no merit, such as Patrick intentionally damaged Amor's property. Plaintiffs allege that Amor acting in concert with Davis, Simpson, and Bennett harassed and bullied Plaintiff's and damaged their reputation, impaired their career advancement, and caused them and their daughters to suffer severe emotional distress including but not limited to anxiety, lack of sleep, humiliation, economic hardship, lost enjoyment of life, and loss of consortium when they maliciously falsified evidence, and presented fabricated evidence to the court, put it into a public record and maliciously refused to provide exculpatory evidence and arrested Patrick based on the falsified allegations.

283. Patrick was denied due process of the Bill of Rights that are protected by the

united states Constitution and the Georgia Constitution when the Defendant's deposited Patrick in jail instead of bringing him before a Judicial Officer to see if a warrant shall issue.

284. Defendants, and each of them, had, at all times relevant herein, an affirmative duty and obligation to recognize, acknowledge, and respect the Plaintiffs' rights, and to conduct themselves in a manner that confirms, provides for the preservation of, and does not violate the rights guaranteed Plaintiffs under the United States Constitution, including, without limitation, the protection of the right to life, liberty, pursuit of happiness, the right to privacy, family integrity right to be free from governmental interference into their lives and the right to familial relations, as these rights apply to Plaintiffs.

285. Defendants, and each of them, at all relevant times herein were acting under color of law when they jointly acted, or knew and agreed and thereby conspired, to violate Plaintiffs' constitutional rights by, but not limited to, removing, detaining, and continuing to detain Patrick without proper or just cause and/or authority, in the absence of any exigency, and without first obtaining a lawful warrant or other court order - thereby violating Plaintiffs' rights under the First, Fourth and Fourteenth Amendments to the Bill of Rights and the United States Constitution, as these rights apply to Plaintiffs.

286. None of the Defendants sought, or obtained, a lawful warrant - or any other type of court order, prior to seizing Patrick. Defendants, and each of them, jointly acted or conspired to seize Patrick as described above, knowing that no warrant authorizing his seizure had been issued and that exigent circumstances did not exist. They also knew that Patrick did not consent to said unwarranted seizure.

287. In the alternative, with respect to Simpson, through his extensive training as a Chief Deputy for the Brantley County Sheriff's Department, on information and belief, he

was aware of the aforementioned constitutional rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. On information and belief, Simpson was equally aware through his training and experience that he had an affirmative obligation to intercede and intervene to protect the rights of an Ambassador and his family, like Plaintiffs, when he witnessed constitutional rights being violated by other government agents. Not only did he stand by and fail to intercede and intervene on Plaintiffs' behalf- he went so far as to participate, provide agreement, concurrence, and armed support for Amor, and Bennett when he seized Patrick.

288.  In the alternative, with respect to Bennett, through his extensive training as a  deputy for the Brantley County Sheriff's Department, on information and belief, he was aware of the aforementioned constitutional rights of men and women to the right of life, liberty, and the pursuit of happiness without government interference. On information and belief, he was equally aware through his training and experience that he had an affirmative obligation to intercede and intervene to protect the rights of an Ambassador and his family, like Plaintiffs, when Simpson witnessed constitutional rights being violated by other government agents. Not only did he stand by and  fail  to intercede and intervene on Plaintiffs' behalf - he went so far as to order participate, provide agreement, concurrence, and armed support for Amor when together they planned and executed Patrick's arrest without a lawful warrant supported by probable cause and in the absence of any evidence of wrongdoing on Plaintiff's part.

289.  In the alternative, with respect to Sheriff DAVIS, under the color of law through his extensive training as a Sheriff, on information and belief, he was aware

of the aforementioned constitutional rights of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized and the constitutional rights of men and women to life, liberty, and the pursuit of happiness without government interference. On information and belief, he was equally aware through his training and experience that Davis had an affirmative obligation to intercede and intervene to protect the rights of an Ambassadors family, like Plaintiffs, when he witnessed their constitutional rights being violated by fellow officers. Not only did he stand by and fail to intercede and intervene on Plaintiffs' behalf - he went so far as to provide agreement, concurrence, and support for BENNETT, SIMPSON, and AMOR when he failed to intervene and after Patrick's seizure without a lawful warrant and in the absence of any exigency.

290. No reasonable government agent in Defendants' position could have believed that their conduct, i.e., agreeing to and supporting and/or failing to intercede or intervene to stop the unwarranted seizure of Plaintiff under the circumstances then presented was lawful.

291. As a direct and proximate result of these Defendants' misconduct, Plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety, emotional distress, pain and anguish, loss of consortium, financial loss, loss of use of property and loss of freedom among other things.

292. Due to the malicious, wanton, callous, reckless, wrongful and despicable nature of the Defendants' misconduct, as herein alleged and described, Plaintiffs are entitled to recover, and shall seek, punitive damages against the individual Defendants, and each of

them, in accordance with law and subject to proof at trial.

### COUNT 8
### (Sixth Amendment to the Constitution)
### By PLAINTIFF'S Hollie Roether
### Against Defendants County of McIntosh
### and DOES 1 through 100, inclusive

Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein including 1-292 and Jurisdiction

293.  Plaintiff Hollie has a right under the Sixth Amendment to Counsel at all critical stages of the prosecution.

294.    Defendant County of McIntosh violated Plaintiff's right to equal protection and due process under the Fourteenth Amendment when they unreasonably denied Hollie access to counsel such as she couldn't argue for her pretrial liberty. Defendant County of McIntosh denied Hollie access to counsel and the law library, having a duty to know the law however, failed to adopt rules and guidelines or to exercise supervision over judicial officers and said failures led to deprecation of Hollie's ability to argue her pretrial liberty in violation of due process under the color of state law of which is sufficient to state a claim for monetary relief against defendant(s) and state authorities.

### SECOND CLAIM - Monell-Related Claims
### COUNT1

### By PLAINTIFFS Ambassador Patrick and Hollie Roether
### Against COUNTY OF MCINTOSH, COUNTY OF HOUSTON, COUNTY OF
### CARROLL, COUNTY OF BENTON, COUNTY OF BRANTLEY and their
### SHERIFF'S OFFICES/DEPARTMENTS

Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein including 1-294 and Jurisdiction

295.  Defendant County of McIntosh, County of Benton, County of Houston, County

of Carroll, County of Brantley including through its sheriff's departments, are a "person" within the meaning of 42 U.S.C. § 1983 and subject to Monell liability. Monell v. Dept. of Social Services (1978) 436 U.S. 658. Defendants, and each of them, acted under colour of state law when committing the acts alleged herein, in violation of Patrick, Hollie, L.Y., and Y.R.'s rights as said rights apply to them.

296. Defendant County of McIntosh, County of Benton, County of Houston, County of Carroll, County of Brantley including through their Sheriff Departments, and those individuals in their official capacity who had supervisory and/or policy making authority, had a duty to Plaintiffs to establish, implement and follow policies, procedures, customs and/or practices which confirm and provide the protections guaranteed Plaintiffs under the United States Constitution, including those under the First, Fourth, and Fourteenth Amendments. This includes, without limitation, the protection of the right to familial relations; the right to privacy; and the rights to substantive and procedural due process.

297. Defendant County of McIntosh, County of Benton, County of Carroll, County of Houston, and County of Brantley also had a duty to use reasonable care to select, assign, supervise, train, control and review the activities of all their agents, officers, employees and those acting under them, including within the McIntosh County Sheriff's Department, Benton County Sheriff's Department, Houston County Sheriff's Department, Carroll County Sheriff's department, and Brantley County Sheriff's Department so as to protect these constitutional rights; and to refrain from acting with deliberate indifference to the constitutional rights of Plaintiffs in order to avoid causing the injuries and damages alleged herein.

298. Moreover, based on the duties charged to the McIntosh County Sheriff Jessup his officers, including the powers to seize children from their parents' care, the County and its policy making officials knew or should have known of the need to establish

customs, policies, and practices required to protect the aforementioned civil rights of parents and their children with whom their agents regularly came into contact - and to adequately train its employees on constitutionally appropriate policies and practices.

299. Defendant County of McIntosh established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the McIntosh County Sheriff Steve Jessup and his officers when they violated Plaintiffs' constitutional rights by seizing L.R. and Y.R. from Plaintiffs' care and custody without first obtaining a warrant where the children were in no danger of suffering severe bodily injury or death in the time it would have taken to obtain a warrant, among other things.

300. In addition, Defendant County of McIntosh established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the McIntosh County Sheriff's Department and its officers when they violated Plaintiffs' constitutional rights by continuing to detain L.R. and Y.R. and/or by causing L.Y. and Y.R. to continue to be detained from Plaintiffs' custody when it was known that there was not a basis to do so.

301. Defendant County of McIntosh established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the McIntosh County Sheriff's Department and its officers when they violated Plaintiffs' constitutional rights by seizing Plaintiffs without first obtaining a warrant, where there is no evidence at the time of the arrest the government agent witnesses an offense in the agents presence, or with his or her immediate knowledge, if the offender is attempting to escape, or there is probable cause to believe an act of family violence has occurred.

302. In addition, Defendant County of McIntosh established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which

were followed, complied with, and carried out by the McIntosh County Sheriff's Department and its officers when they violated Plaintiffs' constitutional rights by continuing to detain Plaintiffs and/or by causing Plaintiffs to continue to be detained when it was known that there was not a basis to do so.

303. In addition, Defendant County of McIntosh established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the McIntosh County Sheriff's Department and its officers when they violated Plaintiffs' constitutional rights by taking Hollie's finger prints, clothes, spraying and throwing scolding hot water on Hollie and throwing chemicals all over Hollie's body over her objections.

304. Defendant Sheriff Jessup is responsible for the operation of the McIntosh County Detention Center and the release and detention of arrestees. As a matter of policy and practice, Jessup keeps arrestees in jail without a warrant and without taking arrestees before a Judicial Officer, and without bail for over 45 hours. Jessup maintains this policy and practice even for arrestees he knows were arrested without a warrant.

305. At the time of the underlying events, the regularly established customs and practices of the County of McIntosh Sheriff's Department that were followed, adhered to, complied with, and carried out by PERRY, CHAPMAN, LEE, LOWE, BRENNEN, GONZALEZ, JESSUP and each of them, were the moving force, that is, the actual, direct, and proximate cause of the violations of Plaintiffs' constitutional rights including, but not limited to;

A. The custom and/or practice of detaining and/or removing children from the custody of their parents in the absence of exigent circumstances (immediate danger of serious bodily injury), without first obtaining a court order/warrant, without first engaging in a reasonable investigation, and/or first obtaining consent of the child's parent;

B. The policy, custom, and/or practice of removing children from their family and their homes without first performing and/or pursuing any and/or reasonable investigation, and then only investigating allegations of neglect or abuse, after the unwarranted seizure is fait accompli;

C. The policy, custom, and/or practice of removing and detaining children, and continuing to detain them for an unreasonable period long after any alleged basis for detention is negated or otherwise known to lack merit;

D. The policy, custom, and/or practice of causing the continued detention of a child to be prolonged even though there is no factual basis to support the continued detention of the child;

E. The practice of turning a deliberate blind eye to the need for further or adequate training by ignoring repeated violations of the rights of children and parents with whom McIntosh County Sheriff's Department officers can regularly be expected to come into contact by failing and/or refusing to implement a practice of regular and adequate training and/or supervision, and/or failing to train and/or supervise its officers, agents, employees and state actors, in providing and ensuring compliance with the constitutional protections guaranteed to individuals, including those under the First, Fourth, and Fourteenth Amendments to the United States Constitution.[3]

306. Each of the above enumerated customs, policies, or practices is evidenced by the consistent failure on the part of the County of McIntosh to investigate violations of constitutional rights by law enforcement officers of a similar nature; and, the consistent failure by the McIntosh County Sheriff's Department to discipline its officers and their supervisors who are involved in constitutional violations of a similar nature so that violations of citizen's constitutional rights have not only

---

[3] This list is not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings. Plaintiffs may seek leave to amend this pleading as more information becomes available.

become accepted, but are customary.

307. On information and belief, Defendant County of McIntosh has engaged in each of the customs and/or practices identified above on an ongoing and continuous basis since at least 2004, if not earlier, and continues to engage in these practices on an ongoing and daily basis.

308. The Defendant County of McIntosh is aware that its officers seize children from the care of their parents without first obtaining judicial authorization, parental consent, and/or pursuing reasonable avenues of investigation, when there is no emergency circumstance and in contravention of the rights of both parents and children. Yet, Defendant County of McIntosh made a knowing and conscious decision to refrain from promulgating a policy and recurrent training to prevent such misconduct, and has consistently and knowingly failed to provide any training to their officers to inform them of the rights of parents and children to remain together absent undue government interference, the obligation of the officers to first obtain a warrant before seizing children from their parents when no exigency exists.

309. Defendant County of McIntosh failed to establish, adopt, and/or implement policies, procedures, and training regarding the constitutional protections afforded to a parent and child by the First, Fourth, and Fourteenth Amendments. Without such policies, procedures, customs and/or practices in place, the County of McIntosh's law enforcement officers were allowed and permitted to engage in conduct that was in violation of Plaintiffs' constitutional rights as more specifically set out in the General Allegations above.

310. Defendant County of Brantley established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the Brantley County Sheriff's Department and its officers when

they violated Plaintiffs' constitutional rights by seizing Patrick where there is no evidence at the time of the arrest the government agent witnesses an offense in the agents presence, or with his or her immediate knowledge, if the offender is attempting to escape, or there is probable cause to believe an act of family violence has occurred.

311. In addition, Defendant County of Brantley established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the Brantley County Sheriff's Department and its officers when they violated Patrick's constitutional rights by continuing to detain Patrick and/or by causing Patrick to continue to be detained when it was known that there was not a basis to do so.

312. In addition, Defendant County of Brantley established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the Brantley's County Sheriff's Department and its officers when they violated Patrick's constitutional rights by taking Patrick to jail instead of before a Magistrate and took Patrick's finger prints, and clothes over his objections.

313. Defendant Len Davis is responsible for the operation of the Brantley County Detention Center and the release and detention of arrestees. As a matter of policy and practice, Davis keeps arrestees in jail without taking arrestees before a Judicial Officer. Davis maintains this policy and practice even for arrestees he knows were arrested with a warrant that commands him to take the arrestee in front of a Magistrate.

314. At the time of the underlying events, the regularly established customs and practices of the County of Brantley's Sheriff's Department that were followed, adhered to, complied with, and carried out by DAVIS, BENNETT, and SIMPSON, and each of them, were the moving force, that is, the actual, direct, and proximate cause of the violations of Plaintiffs' constitutional rights including, but not limited to;

A. The practice of turning a deliberate blind eye to the need for further or adequate training by ignoring repeated violations of the rights of men and women with whom Brantley County Sheriff's Department officers can regularly be expected to come into contact by failing and/or refusing to implement a practice of regular and adequate training and/or supervision, and/or failing to train and/or supervise its officers, agents, employees and state actors, in providing and ensuring compliance with the constitutional protections guaranteed to individuals, including those under the First, Fourth, and Fourteenth Amendments to the United States Constitution.[4]

315. On information and belief, the Defendant County's, each and every one of them, failure to adopt such policies and training was the moving force behind the violations of Plaintiff's constitutional rights. Such failures include, but are not limited to:

A. The County of McIntosh, and the County of Benton had no written policy, procedure, custom, practice and/or training regarding the circumstances under which a law enforcement officer must obtain judicial authorization prior to removing a child from the custody of its parent(s);

B. The County of McIntosh, and the County of Benton had no written policy, procedure, custom, practice and/or training requiring a law enforcement officer to obtain judicial authorization prior to removing a child from the custody of its parent(s), when there was no evidence that the child was in immediate risk of suffering serious bodily injury at the hands of its parent(s);

C. The County of McIntosh and the County of Benton had no written policy, procedure, custom, or practice to require recurrent training of its law enforcement officers delineating the constitutional protections afforded to a parent and child by

---

[4] This list is not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings. Plaintiffs may seek leave to amend this pleading as more information becomes available.

the First, Fourth, and Fourteenth Amendments;

D. The County of McIntosh and the County of Benton had no written policy, procedure, custom, practice and/or training regarding the circumstances under which a law enforcement officer can arrest a man or woman without a warrant;

E. The County of McIntosh, County of Benton, County of Brantley had no written policy, procedure, custom, practice and/or training regarding the circumstances under which a law enforcement officer is to take a man or woman arrested with or without a warrant before a Judicial Officer;

F. The County of McIntosh and the County of Benton had no written policy, procedure, custom, or practice to require recurrent training of its law enforcement officers to instruct them that they must possess "specific, articulable evidence" that a child would be placed at immediate risk of suffering serious harm at the hands of the parent(s), prior to removing the child from its parent's custody without judicial authorization;

G. The County of McIntosh and Coounty of Benton had no written policy, procedure, custom, or practice to require recurrent training of its law enforcement officers instructing that a law enforcement officer must pursue reasonable avenues of investigation before removing a child from the custody of its parent(s), when there was no evidence that the child was in immediate risk of suffering serious bodily injury.

H. The County of McIntosh had no written policy, procedure, custom, or practice to require recurrent training of its law enforcement officers instructing law enforcement officer must pursue reasonable avenues of adhering to a person's religious beliefs in the stead of torturing a person into submission, when there was no evidence that the adhering to a person's religious beliefs would put the person in immediate risk of suffering serious bodily injury.

316. By deliberately refraining from promulgating any of the aforementioned

policies, procedures, customs, practices and/or training, the County's permitted the aforementioned basic policy decisions to be made by the lower level law enforcement officers in the field. As a result, the Defendants County of McIntosh and County of Benton's policy, custom, and/or practice - as established, adopted, and implemented by the Sheriff's Department Defendants - was to arrest the parents and detain their children without judicial authorization, parental consent, and without specific, articulable evidence to suggest that the child is in immediate risk of suffering serious bodily injury at the hands of that parent, and then to continue to detain the child even though they knew there was no legitimate basis to do so; and then to continue to detain the child or otherwise cause the continued detention of the child even thought it was known that there was no factual basis to do so.

317. The state of the law regarding the constitutional protections afforded to a parent and child by the First and Fourteenth Amendments was clearly established well before September 3, 2014, and  September 7, 2019. As such, the Defendant County of McIntosh and County of Benton knew before 2014 that its law enforcement officers required recurrent training on the constitutional protections afforded to a parent and child. On information and belief, despite this knowledge, the Defendant County of McIntosh and County of Benton deliberately failed to train or, alternatively, deliberately failed to provide recurrent and updated training to its law enforcement officers on the following constitutional protections:

318. The County of McIntosh and County of Benton did not provide recurrent training to its law enforcement officers regarding the circumstances under which judicial authorization must be obtained prior to removing a child from the custody of its parent(s);

319. The County of McIntosh and the County of Benton did not provide recurrent

training to its law enforcement officers regarding the circumstances under which a warrant must be obtained prior to arrest;

320. The County of McIntosh and the County of Benton did not provide recurrent training to its law enforcement officers regarding the circumstances under which an arrest can be done without a warrant;

321. The County of McIntosh and County of Benton did not provide recurrent training to its law enforcement officers regarding the fact that judicial authorization must be obtained prior to removing a child from the custody of its parent(s), when there was no evidence that the child was in immediate risk of suffering serious bodily injury;

322. The County of McIntosh and County of Benton did not provide training to its law enforcement officers on the well-established constitutional protections afforded to a parent and child by the First, Fourth, and Fourteenth Amendments.

323. The Defendant County of McIntosh's deliberate failure to train its law enforcement officers on these established constitutional protections was a substantial factor in causing the Plaintiffs harm, in that officers working for the Defendant County of McIntosh were unfamiliar with and oblivious to the Plaintiffs' constitutional rights, when the County's sheriff's deputies and/or detectives, seized L.R. and Y.R., without judicial authorization, parental consent, and in the absence of exigent circumstances.

324. The Defendant County of McIntosh's deliberate failure to train its law enforcement officers on these established constitutional protections was a substantial factor in causing the Plaintiffs harm, in that officers working for the Defendant County of McIntosh were unfamiliar with and oblivious to the Plaintiffs' constitutional rights, when the County's sheriff's deputies and/or detectives, arrested Plaintiffs without judicial authorization, absence the existence of any crime or

exigent circumstances.

325. The Defendant County of McIntosh's decision to disregard these constitutional protections in the face of a known need for such policies to prevent the specific misconduct alleged herein above, i.e., the known need for a specific policy prohibiting the aforementioned misconduct, is itself a "policy" decision which constitutes a policy of deliberate indifference.

326. This policy of deliberate indifference, and the lack of prophylactic policies and training in the face of a known need for such policies and training was a substantial factor in causing the Plaintiffs harm, in that the McIntosh County Sheriff's Department and its officers followed and acted pursuant to the regularly established customs, practices, and well known and accepted standard operating procedures of the McIntosh County Sheriff's Department when they seized L.R. and Y.R. from their parents' custody and care without judicial authorization, parental consent, and without specific, reasonable, and articulable evidence to suggest that either child was in immediate risk of suffering serious bodily injury - none of which was constitutionally permissible.

327. Defendant County of Benton, County of Carroll, County of Houston established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the County of Benton, County of Carroll, County of Houston Sheriff's Departments and its officers when they violated Plaintiffs' constitutional rights by detaining Hollie without first obtaining a warrant and/or other commitment documentation, where there is no evidence at the time of the arrest the government agent witnesses an offense in the agents presence, or  with his or her immediate knowledge, if the offender is attempting to escape, or there is probable cause to believe an act of family violence has occurred.

328. In addition, Defendant County of Benton, County of Houston, County of Carroll established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the Benton, Carroll, and Houston County Sheriff's Department and its officers when they violated Plaintiffs' constitutional rights by continuing to detain Hollie and/or by causing Hollie to continue to be detained when it was known that there was not a basis to do so.

329. Defendant County of Benton, County of Carroll, County of Houston established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the County of Benton, County of Carroll, County of Houston Sheriff's Departments and its officers when they violated Plaintiffs' constitutional rights by detaining Hollie without first obtaining a warrant and/or other commitment documentation, where there is no evidence at the time of the arrest the government agent witnesses an offense in the agents presence, or   with his or her immediate knowledge, if the offender is attempting to escape, or there is probable cause to believe an act of family violence has occurred.

330. In addition, Defendant County of Brantley established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the       Brantley County Sheriff's Department and its officers when they violated Patrick's constitutional rights by continuing to detain Patrick and/or by causing Patrick to continue to be detained when it was known that there was not a basis to do so.

331. Defendant County of Brantley established, adopted, followed, and/or implemented and/or turned a blind eye to customs, and/or practices which were followed, complied with, and carried out by the County of Brantley Sheriff's

Departments and its officers when they violated Plaintiffs' constitutional rights by detaining Patrick without first obtaining any commitment documentation, where there is no evidence at the time of the arrest the government agent witnesses an offense in the agents presence, or with his or her immediate knowledge, if the offender is attempting to escape, or there is probable cause to believe an act of family violence has occurred.

332. Defendant Sheriff Christopher is responsible for the operation of the Benton County Detention Center and the release and detention of arrestees. As a matter of policy and practice, Christopher keeps arrestees in jail without a warrant and without taking arrestees before a Judicial Officer, and without bail for over 20 days. Christopher maintains this policy and practice even for arrestees he knows were arrested without a warrant.

333. Defendant Sheriff Sugg is responsible for the operation of the Houston County Detention Center and the release and detention of arrestees. As a matter of policy and practice, Sugg keeps arrestees in jail without a warrant and without taking arrestees before a Judicial Officer, and without bail for over 20 days. Sugg maintains this policy and practice even for arrestees he knows were arrested without a warrant.

334. Defendant Sheriff Davis is responsible for the operation of the Brantley County Detention Center and the release and detention of arrestees. As a matter of policy and practice, Davis keeps arrestees in jail without taking arrestees before a Judicial Officer, and without committal papers. Davis maintains this policy and practice even for arrestees he knows were arrested with a warrant commanding the arrestee to be brought before a Judicial Officer.

335. County of Brantley as a matter of policy and practice set excessive bonds without inquiring into the arrestees ability to pay. Moreover, Plaintiff, Patrick has a fundamental interest in his pretrial liberty under state and federal law. Defendants'

requirement that a person arrested for a petty offense pay a monetary bail amount determined without inquiring into their ability to pay or considering less restrictive alternatives is not narrowly tailored to achieve the government's interests in securing a defendant's appearance in court or public safety.

336. Defendant Sheriff Dickson is responsible for the operation of the Carroll County Detention Center and the release and detention of arrestees. As a matter of policy and practice, Dickson keeps arrestees in jail without a warrant and without taking arrestees before a Judicial Officer, and without bail for over 3 days. Dickson maintains this policy and practice even for arrestees he knows were arrested without a warrant. At the time of the underlying events, the regularly established customs and practices of the County of Benton, Houston, and Carroll County's Sheriff's Department that were followed, adhered to, complied with, and carried out by Lambright, Bolan, Lowe, Stenander, Jane Doe 3, Jane Doe 6 and each of them, were the moving force, that is, the actual, direct, and proximate cause of the violations of Plaintiffs' constitutional rights including, but not limited to:

a. The practice of turning a deliberate blind eye to the need for further or adequate training by ignoring repeated violations of the rights of people with whom the Benton, Carroll, McIntosh, Brantley, and Houston County's Sheriff's Department officers can regularly be expected to come into contact by failing and/or refusing to implement a practice of regular and adequate training and/or supervision, and/or failing to train and/or supervise its officers, agents, employees and state actors, in providing and ensuring compliance with the constitutional protections guaranteed to individuals, including those under the First, Fourth, and Fourteenth Amendments to the United States Constitution.[5]

---

[5] This list is not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings. Plaintiffs may seek leave to amend this pleading as more information becomes available.

337. Each of the above enumerated customs, policies, or practices is evidenced by the consistent failure on the part of the Benton, Carroll, Brantley, McIntosh, and Houston County to investigate violations of constitutional rights by law enforcement officers of a similar nature; and, the consistent failure by the Benton, Carroll, McIntosh, Brantley, and Houston County Sheriff's Department to discipline its officers and their supervisors who are involved in constitutional violations of a similar nature so that violations of citizen's constitutional rights have not only become accepted, but are customary.

338. The Defendants Benton, Carroll, Brantley McIntosh, and Houston County's' deliberate failure to train its law enforcement officers on these established constitutional protections was a substantial factor in causing the Plaintiffs harm, in that officers working for the Defendant Benton, Carroll, McIntosh, and Houston County's' were unfamiliar with and oblivious to the Plaintiffs' constitutional rights, when the County's sheriff deputies and/or detectives, detained Hollie without judicial authorization, absence the existence of any crime or exigent circumstances, housed Hollie inadequately and in inadequate unsanitary conditions, and inadequate medical attention.

339. The Defendant Benton, Carroll, Brantley, McIntosh, and Houston County's' decision to disregard these constitutional protections in the face of a known need for such policies to prevent the specific misconduct alleged herein above, i.e., the known need for a specific policy prohibiting the aforementioned misconduct, is itself a "policy" decision which constitutes a policy of deliberate indifference.

340. Plaintiffs are informed and believes that, the Defendant County of McIntosh, County of Benton, County of Carroll, County of Brantley, County of Houston never investigates, reprimands, disciplines, and/or discharges its law enforcement officers who engage in the type of conduct alleged herein. Plaintiffs are informed and believes

that, the County of McIntosh, County of Benton, County of Carroll, County of Brantley, County of Houston has refused and continues to refuse to admit that its officers commit a constitutional violation when they engage in the type of conduct alleged herein.

341. These actions, and/or inactions, of County of McIntosh, County of Benton, County of Brantley, County of Carroll, County of Houston were the moving force behind, and direct and proximate cause of Plaintiffs' injuries, as alleged herein; and as a result, Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial. In addition, Plaintiffs have incurred, and will continue to incur, costs and expenses, including those as authorized by 42 U.S.C. § 1988, to an extent and in an amount subject to proof at trial.

## COUNT 2

**(Deceptive Business Practices) By PLAINTIFFS
Ambassador Patrick and Hollie Roether
Against STATE OF TENNESSEE, STATE OF GEORGIA, MCINTOSH COUNTY
SHERIFF'S OFFICE, AND DEFENDANT ISABELLA AMOR**

Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein including 1-341 and Jurisdiction.

342. The McIntosh County Sheriff's Office operates a governmental service business which makes a profit off of allowing its agents to bring false charges against innocent men, and women especially against the Plaintiffs, and taking their children and putting them up for adoption while they claim their business operates as such; "The mission of the McIntosh County Sheriff's Office is to establish a safe and secure environment for all those who invest in our historical community. We will accomplish this goal by promoting and fostering the aggressive enforcement of law and order in a fair and impartial manner, by protecting individual rights, life, and property, by focusing on reducing crime and maintaining livable

neighborhoods, and by developing partnerships that benefit the needs of our citizens. "To enhance the quality of life of those we serve by providing optimal public safety services with the commitment to the highest standards of excellence, professionalism and integrity.[6]" This business operates far from advertised. Please see all of the allegations against this business as stated hereinabove and incorporated herein its entirety by reference. They profited off of and continue to profit off of Plaintiffs and their children, when Defendant Lee created documents with the intent to use them to prosecute Plaintiff's on charges she knew or should have known were false, and when Defendant Askew, and Gray stole Plaintiff's daughters L.R. and Y.R. and initiated an adoption proceeding. The State of Georgia acting in concert with the County of McIntosh generated a revenue by deceptive means when they allowed its agents to pursue false criminal charges against Plaintiffs and continue to keep the bond money with the intent to make a profit which they did. The State of Georgia further generated revenue by deceptive means when they allowed its agents to take L.R. and Y.R. from plaintiffs initiate an adoption proceeding with L.R. and Y.R. being the targeted potential adoptees with the intent to make a profit from forced child welfare services, which they did.

343. The State of Tennessee operates a governmental service business who claims to which makes a profit off of allowing its agents, especially Defendant Stowe, to bring false charges against innocent men, and women especially against Hollie. The State of Tennessee profited off of Hollie when Defendant Stowe and Bolan created documents with the intent to use them to prosecute Hollie on charges he knew or should have known were false. The State of Tennessee generated revenue by deceptive means when they allowed its agents to pursue false criminal charges against Hollie with the intent to make a profit, which they did. The State of Tennessee has further generated revenue off of Hollie and her son J.P. by fabricating criminal charges against Hollie,

---

[6] https://www.mcintoshcountyso.com/

taking her son from her care without a warrant and/or exigent circumstances, having court hearings without her and then released Hollie's son from foster care under guardianship with the intent to collect the Adoption and Legal Guardian Incentive which is a part of the Adoption and Safe Families Act of 1997 (ASFA, P.L. 105-89) in order to keep Hollie's son in a home, against Hollie's will, that will religiously accept all the services they offer with the intent to maximize profits. The State of Tennessee Department of Children's Services an agency of the State of Tennessee whom administers the child welfare program in Tennessee advertises its Mission as follows "Provide high quality prevention and support services to children and families that promote safety, permanency and well-being." and outwardly appears to help children and families while secretly having their agents and contractors such as Defendant Bolan seize parents children's without a warrant and/or court order or exigent circumstances.

344. The agents of the State of Tennessee and the State of Georgia have a policy, custom, and institutionalized practice of putting people in jail without warrants and then taking their children without warrants absent exigent circumstances.

345. Defendant Amor operates a Ministry called Who's Yah Daddy Ministries, now named Who's Yah Daddy Fellowship[7]. She advertises that she helps orphans and widows, feeds the homeless, and clothes the naked[8] when in reality she collects money from people and uses it to enhance her lavish lifestyle, appearance, and personal motives.

### THIRD CLAIM Religious-Related claims
### COUNT1

**(Deprivation of Constitutional Rights under the First Amendment)By PLAINTIFFS Ambassador Patrick and Hollie Roether Against COUNTY OF MCINTOSH, COUNTY OF HOUSTON, COUNTY OF CARROLL, COUNTY OF BENTON, MCINTOSH COUNTY DFCS, COUNTY OF BRANTLEY, GRAY, ASKEW, CHAMBERLIN, DOE 9, COLLIPP, (Does 1-100 exclusively)**

---

[7] https://www.facebook.com/groups/2026295964.19797, https://www.facebook.com/whosyahdaddyministries,
[8] https://www.facebook.com/groups/2026295964.19797/posts/3737017713010950,
https://www.facebook.com/makepeace.love/posts/307160915985443,

Plaintiffs incorporate the above allegations of fact and law as though fully set forth herein including 1-345 and Jurisdiction.

346. Defendants have violated Plaintiffs First Amendment rights by prohibiting Plaintiffs from directing the upbringing of L.R. and Y.R. according to their religious beliefs. Defendants have violated Y.R. and L.R. First Amendment rights by prohibiting them to be brought up in accordance with the families religious beliefs. The Defendants have deprived Y.R. of her mother, Hollie's, breast milk.

347. The Defendants has overridden Plaintiffs religious beliefs by depriving Y.R. of Hollie's breast milk and administering pharmaceutical drugs to Y.R.

348. Any such policy, whether ad hoc or unwritten, is not narrowly tailored to serve a significant governmental interest. Whatever justifications the government has for restricting Plaintiffs from exercising their religious beliefs in the way they lives, the way the register their children's birth and the way they uses natural medicines for healing, and Plaintiffs do not concede that there are any, such justifications are already served by the Georgia statute that prohibits Treatments by spiritual means "A parent, guardian, or legal custodian's reliance on prayer or other religious nonmedical means for healing in lieu of medical care, in the exercise of religious beliefs," GA Code § 15-11-107 (2018), the Guidelines that prohibit parents to rely on nonmedical means for healing in lieu of medical care. In this instance Plaintiffs was not seeking to rely on nonmedical means for healing they were simply doing what any loving mother would do; Treat their children with natural medicine that has been shown to have no harmful side effects and can cure illnesses instead of suppress the immune system such as the dangerous medicines the McIntosh County DFCS agents administered to Y.R. and L.R.

349. To the extent that there is any statute, regulation, or guideline of which Plaintiffs are not aware which authorizes, it is unconstitutional.

350. Y.R. was subjected to invasive medical examinations, including extracting Y.R. bodily fluids, at SGMC without the consent, knowledge, or presence of either Plaintiffs. These examinations were performed by John Ledwich III at the request of Doe 10.

351. No reasonable agent in Defendants' position could have believed that their conduct, i.e., agreeing to and supporting the warrantless medical examination of L.R. and Y.R. under the circumstances then presented, was lawful.

352. As a direct and proximate result of these Defendants' misconduct, Plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety and anguish, among other things.

353. Due to the malicious, wanton, callous, reckless, wrongful and despicable nature of the Defendants' misconduct, as herein alleged and described, Plaintiffs are entitled to recover punitive damages against the individual Defendants, and each of them, in accordance with law and subject to proof at trial.

Jury Demand

All of the above is incorporated herein by reference as if fully stated again including 1-353 and Jurisdiction.

354. Plaintiffs demand a jury trial as to all issues so triable.

Relief

Plaintiffs incorporate the above allegations of fact and law including 1-354 and Jurisdiction as though fully set forth herein.

355. The Acts, Conduct, and Behavior of the Defendants, taken separately and as a whole, were performed knowingly, intentionally, and maliciously, by reason of which the Plaintiffs are entitled to relief.

WHEREFORE, Plaintiffs demands Judgment:

(a) General damages and special damages according to proof, but in no event

less than $8,000,000;

(b) That Plaintiffs be awarded nominal, compensatory, and punitive damages, and that there be a jury trial with respect to such relief.

(c) *As* against only the individual defendants and SGMC, but not any municipality, punitive damages as allowed by law;

(d) That all costs of this action be truced against Defendants.

(e) That judgment be entered in favor of Plaintiffs and against Defendants.

(f) That the Court award any additional or alternative relief as may be deemed appropriate and just under the circumstances.

(g) Injunctive relief, both preliminary and permanent, as allowed by law, (including preliminary injunctive relief based upon a separate application); or alternatively that the Welfare and Institutions Code, as applied by the County of McIntosh in the filing and pursuit of its juvenile dependency petitions be declared unconstitutional as applied;

(g) Plaintiff's reserve the right to amend this complaint as becomes necessary.

I, Patrick and Hollie Roether certify that we have read this complaint and it is true, correct, and not misleading.

Dated this ____7th____ day of September 7th , 2021

Patrick and Hollie Roether
C/O P.O. Box 166
Meridian, Georgia 31319
912-324-0048
ambassadorpatrick@diplomats.com
hjthisthat@gmail.com

Witnessed by:

1. _E. J. Crouch_

2. _Arlene Crouch_

as:

"...at the mouth of two witnesses, or at the mouth of three witnesses, shall the matter be established," Deuteronomy 19:15